# EXHIBIT C

# Deposition Transcript of Kimberly Patrick

# (relevant portions)

Wiley vs City of Atlanta                 Kimberly Patrick                 12/21/2016

```
 1                    IN THE UNITED STATES DISTRICT
                      NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION

 3
     LATONYA NIX WILEY,
 4
               Plaintiff,
 5                                      CIVIL ACTION FILE
     vs.                                NO. 1:16-CV-00031-CC
 6
     CITY OF ATLANTA, GEORGIA,
 7
               Defendant.
 8
                                   *   *   *
 9
                           DEPOSITION OF
10
                         KIMBERLY PATRICK
11
                        December 21, 2016
12
                           10:40 a.m.
13

14      Baker, Donelson, Bearman, Caldwell & Berkowitz, PC

15                         Monarch Plaza

16                          Suite 1600

17                     3414 Peachtree Road, NE

18                         Atlanta, Georgia

19

20
                    Anne Hansen, RPR, CCR #2711
21

22

23

24

25
```

```
 1    In 2011, I believe, we all came back downtown with the
 2    rest of the lawyers in the law department.
 3         Q.  Okay.  All right.  What is your salary now?
 4         A.  126,5-.
 5         Q.  Okay.  Well, when were you promoted into your
 6    current position as deputy city attorney?
 7         A.  So from senior assistant city attorney, at
 8    one point I was promoted to chief counsel.
 9         Q.  So let's stop there.  What are the
10    differences between those two roles?
11         A.  So the deputy is responsible for the entire
12    team, all of the legal issues related to the airport.
13         Q.  Okay.
14         A.  The chief counsel reports directly to the
15    department and is responsible for training, keeping
16    the deputy abreast of what's going on legally,
17    exercising good judgment, keeping up with what's going
18    on in the media, and also handling legal matters as
19    they come up from time to time.
20         Q.  Okay.  Well, let's deal with the first
21    component.  When you say the chief counsel let's the
22    deputy know what's going on legally, what does that
23    mean?  What's going on legally?
24         A.  So the chief counsel helps the deputy with
25    the workflow on the team.
```

Wiley vs City of Atlanta                Kimberly Patrick                12/21/2016

```
 1        Q.  Okay.

 2        A.  And the chief helps the deputy supervise the

 3   other team members.  And so the chief counsel is

 4   responsible for helping them with assignments,

 5   projects, and matters, and also bringing critical

 6   legal issues to the deputy in a timely manner --

 7   manner.

 8        Q.  Okay.  Can you think of an example for the

 9   record that --

10        MS. THOMAS:  You're not asking case specific

11   examples.  Just general topics?

12        MS. WORTH:   Exactly.

13   BY MS. WORTH:

14        Q.  Just a general issue that -- a general legal

15   issue that a chief counsel would bring to -- would be

16   required to bring to the deputy.

17        A.  If a chief counsel is working on an agreement

18   and they see something critical missing from that

19   agreement, that chief counsel is responsible for

20   bringing that to my attention immediately.

21        Q.  Okay.  And then the chief counsel is also

22   responsible for keeping up with media interest and

23   things of that nature and letting the deputy know

24   what's going on and what the media's poking around in

25   and so on and so forth.
```

Wiley vs City of Atlanta                 Kimberly Patrick                 12/21/2016

```
 1        A.   Right.

 2        Q.   Okay.  All right.

 3        A.   They're also responsible -- the chief counsel

 4   is also responsible for having good judgment and

 5   knowing that when there's something critical going on,

 6   to bring those issues to me immediately in real time.

 7   The chief counsel is also responsible for seeing the

 8   big picture --

 9        Q.   Yes.

10        A.   -- as it relates to matters in our office.

11        Q.   So the chief counsel's responsible for having

12   good judgment.  What about the deputy?  Is the deputy

13   responsible for having good judgment, you think?

14        A.   Yes.

15        Q.   Yeah.  Okay.  So also the deputy's

16   responsible for having good judgment --

17        A.   Yes.

18        Q.   -- you think.

19             All right.  And do you think that the deputy

20   should also be honest at all times?

21        A.   Absolutely.

22        Q.   Okay.  So you've been in the City of Atlanta

23   for almost 20 years?

24        A.   Almost 20 years.

25        Q.   Okay.  And you've never worked outside
```

```
 1    government; is that correct?
 2        A.  That's correct.
 3        Q.  Okay.  All right.  When did Ms. Hampton take
 4    over the role of city attorney?
 5        A.  I believe 2010.
 6        Q.  So you've been in the law department the
 7    entire time Ms. Hampton was the city attorney.
 8        A.  That's correct.
 9        Q.  And at this point you report directly to Ms.
10    Hampton; is that accurate?
11        A.  Yes.
12        Q.  All right.  And you sat through -- I believe
13    you sat through Ms. Hampton's deposition?
14        A.  Yes.
15        Q.  Okay.  All right.  So you're aware of her
16    testimony?
17        A.  Yes.
18        Q.  You were present when Ms. Hampton testified
19    that she gives legal advice to the mayor and the city
20    council, correct?
21        A.  Correct.
22        Q.  Do you agree with that?
23        A.  That's correct.
24        Q.  Okay.  All right.  Is it fair to say that a
25    significant part of your role as deputy city attorney
```

```
 1   that unless there's a separate ethics office like the
 2   City of Atlanta has, the only means under the -- to
 3   complain under the Georgia Whistleblower Act is
 4   provided in that statute, which is to file a lawsuit?
 5            MS. THOMAS:  Object to form.
 6        A.  Yes, but I just don't see the issue here.
 7   That's -- that's not my issue.  My issue had nothing
 8   to do with the lawsuit.  My issue had everything to do
 9   with not knowing about the lawsuit for 11 days.
10   BY MS. WORTH:
11        Q.  Okay.  I'm going to ask you just to answer
12   the questions that I'm asking you.  And I appreciate
13   that.  Thank you.
14        A.  But I can explain, correct?
15            MS. THOMAS:  Go ahead.  Finish your answer.
16            THE WITNESS:  Yeah.
17            MS. THOMAS:  If you have more, finish it.
18            THE WITNESS:  That was it.
19   BY MS. WORTH:
20        Q.  You recall my asking Ms. Hampton about Ms.
21   Smith's whistleblower lawsuit that you just commented
22   on just now when you were the deputy, I believe, of
23   that.
24        A.  Uh-huh.
25        Q.  Okay.
```

1       A.  Yes.

2       Q.  Okay.  So would it be fair to say that you

3   would be one of the best people to know what the chief

4   counsel position required since you served in that

5   position, correct?

6       A.  Yes.

7       Q.  Okay.  All right.  Just briefly for the

8   record -- I know you've answered this, and I

9   apologize.  But just because it's been a while, what

10  are the general duties for the chief counsel position?

11      A.  To train members of the aviation team, to

12  keep the deputy apprised of critical legal issues and

13  critical media issues that may arise.

14      Q.  Is that it?

15      A.  No.

16      Q.  Oh, sorry.  Okay.

17      A.  No.  To work with the members of the aviation

18  team to ensure that they complete their assignments in

19  a timely manner --

20      Q.  Okay.

21      A.  -- and that the work is correct; to keep me

22  comprised of their professional growth.  Those were

23  some of the things.

24      Q.  Okay.  Thank you.

25          And Ms. Hampton never served in the position

```
 1        A.   Uh-huh.   Yes.

 2        Q.   -- correct?

 3             And you had asked her to do some background

 4   checking on some candidates including Ms. Wiley during

 5   her candidacy?

 6        A.   I don't know if I asked Ms. Baldwin to do any

 7   checks on Ms. Wiley.   And I wouldn't say they are

 8   background checks.

 9        Q.   Research.

10        A.   Yeah, just research.

11        Q.   Okay.

12        A.   But I don't think Ms. Baldwin would have done

13   the research on Ms. Wiley.   It may have been my legal

14   assistant at the time.

15        Q.   And her name again?

16        A.   Monique Mae.

17        Q.   Monique May.   Okay.   All right.

18             All right.   So you were personally involved

19   in Ms. Wiley's selection for the chief counsel

20   position in the fall of 2014, correct?

21        A.   Yes.

22        Q.   All right.   And you personally conducted her

23   initial interview?

24        A.   Correct.

25        Q.   Which was in October of 2014.
```

1    Henry County; is that fair to say?

2        A.  That's true.

3        Q.  Your paths never crossed.

4        A.  That's correct.

5        Q.  And you did not have any people in common in

6    the -- in your time together, in Henry County.

7        A.  No.

8        Q.  Okay.  I mean, the legal community is small,

9    so on and so forth.

10        So it's fair to say that this is the first

11   time your paths had ever crossed.

12       A.  That's correct.

13       Q.  And you didn't do a "do you know" type of

14   introduction to each other, correct?

15       A.  I don't think so.

16       Q.  Okay.  All right.  And you never asked Ms.

17   Wiley any questions, during the course of her

18   interview in your office in October of 2014, about her

19   termination from Henry County, did you?

20       A.  That's incorrect.  I did ask her.

21       Q.  About her termination from Henry County.

22       A.  I most certainly did.

23       Q.  Okay.

24       A.  Her resume indicated that she was not working

25   there.  I think it said August 2014.  And that alerted

1   me to -- to ask her, "Why are you not still working

2   there?"  And that's when she told me the position had

3   been terminated and that they were bringing in two

4   firms to do the work that she had previously done.

5   And she relayed all of that to me as if it was

6   amicable, there was no issue there, that they were

7   just bringing them in to do her work, and she was

8   moving on to the next opportunity.

9          Because I remember specifically asking her,

10   "Well, how do you feel about that?  You've been in

11   this job as the county attorney, and now they're

12   bringing in two law firms.  How do you feel about

13   that?"

14          And she said, "I'm moving on.  I'm looking

15   for new opportunities."

16   Q.  From this application that was previously

17   marked as Exhibit 6 in Ms. Hampton's deposition that

18   Ms. Wiley completed as part of her candidacy for the

19   position in the City of Atlanta law department, she

20   indicated, prior to the time of her interview with

21   you, that her reason for leaving was "Department

22   outsourced," correct?

23   A.  Correct.

24   Q.  Okay.  And it's fair to say she told you in

25   your -- I guess you met in your office or in the

1       A.   No.  She's the contracts administrator on our

2    team.

3       Q.   What does that mean?

4       A.   She -- she handles all of the contracts that

5    come through our division.  She keeps records of them.

6    She lets us know when they are going to expire.  She

7    can pull them for us when we need them.  She's a

8    contracts administrator.

9       Q.   Okay.  And Diana L. Freeman is who?

10      A.   She is a -- an assistant city attorney on our

11   team.

12      Q.   Okay.  Was she an applicant as well?

13      A.   Yes.

14      Q.   Was she up for the position of chief counsel?

15      A.   No.

16      Q.   Why were you doing research for her?

17      A.   Because she had applied for the senior

18   assistant city attorney position.

19      Q.   Okay.  And LaTonya Nix Wiley was up for the

20   position of?

21      A.   She interviewed for the senior assistant

22   position, but ultimately she went into the chief

23   counsel role.

24      Q.   Okay.  At the beginning of this e-mail to

25   Vernedia, you say "Since this request is taking up a

```
 1        A.   Uh-huh.

 2        Q.   Okay.  All right.  Now, I guess she applied

 3   for both positions, the senior -- is it called senior

 4   assistant?

 5        A.   Senior assistant city attorney.

 6        Q.   And general counsel.

 7        A.   Chief counsel.

 8        Q.   Chief counsel.

 9             How is it that she eventually got the chief

10   counsel?

11        A.   During her interview I found out that she had

12   been county attorney for a number of years.  And I

13   thought with her experience and her skills, she would

14   fit better possibly in the chief counsel position.  At

15   that time I didn't know that she had also applied for

16   the chief counsel position.

17        Q.   So she should have two applications.  Where's

18   the other one?

19        A.   I don't know.

20             MS. WORTH:  Okay.  Well, that's an

21   outstanding discovery request.  So could we look at

22   that?

23             MS. THOMAS:  If there is another application,

24   then, yes, we'll produce that.

25             MS. WORTH:  Thank you.
```

```
 1        A.   I don't believe so, no.

 2        Q.   You don't believe so?

 3        A.   No.

 4        Q.   If you'll turn to the first page.  Do you see

 5   in the third paragraph, "LaTonya Wiley became county

 6   attorney in late 2008"?

 7        A.   Yes.

 8        Q.   Okay.  Thank you.

 9             Do you know who Chairman Tommy Smith is that

10   was quoted in that article?

11        A.   I believe he's the chairman of the Henry

12   County Commission.

13        Q.   Okay.  Have you seen any other articles where

14   Chairman Tommy Smith talks about the outsourcing of

15   the work as being a mistake?

16        A.   No.

17        Q.   So Ms. Wiley was scheduled for an interview

18   with Ms. Hampton on October 13th, 2014, correct?

19        A.   That's probably correct.

20        Q.   Okay.  Why did you decide for Ms. Wiley to

21   have a follow-up interview with Ms. Hampton?

22        A.   I thought she would be a good candidate for

23   the chief counsel role.

24        Q.   Okay.  And you were present for Ms. Hampton's

25   testimony regarding her interview with Ms. Wiley?
```

 1   have any discussions with her regarding Henry County

 2   or her departure --

 3       A.  No.

 4       Q.  -- during those two weeks?

 5       A.  No.

 6       Q.  So in fact -- I mean, just to be clear, if

 7   Ms. Wiley started December 4th, you have a scheduled

 8   vacation that was going to begin when?

 9       A.  Probably a few days before Christmas.

10       Q.  And you were going to be out through the end

11   of the year; is that accurate?

12       A.  That's correct.

13       Q.  Okay.  And would it be fair to say then that

14   you focused your time in those initial weeks, first

15   weeks of Ms. Wiley's employment, getting her

16   acquainted with her colleagues at the law department

17   in the airport?

18       A.  That's correct.

19       Q.  And actually I think you testified to this,

20   that the change had come earlier that you all were

21   back downtown, not at the airport anymore, right?

22       A.  Right.

23       Q.  Okay.  So if you all -- if they had meetings

24   at the airport, then they would have to travel back

25   down to downtown.  They don't -- you all didn't

Wiley vs City of Atlanta              Kimberly Patrick              12/21/2016

1    you were even upset at all?  And in fact, you were

2    sympathetic to Ms. Wiley that morning --

3           MS. THOMAS:  Object to --

4    BY MS. WORTH:

5       Q.  -- of December 30th.

6           MS. THOMAS:  Object to form.

7       A.  I was trying to take it all in.  It wasn't

8    about me being sympathetic, kind, angry.  This was a

9    huge blow.  This was my chief counsel for the world's

10   busiest and most efficient airport telling me that she

11   had not told me that she filed a lawsuit for 11 days.

12   And we saw each other.  We talked.  We e-mailed.  And

13   so I was in shock.  That's how I would describe

14   myself.  I was in shock.  And it was the beginning of

15   me saying I can't trust this person.  I was in shock.

16   BY MS. WORTH:

17      Q.  Wait.  Did you think she filed suit against

18   the City of Atlanta?

19      A.  No.  She told me that she filed a lawsuit

20   against Henry County.

21      Q.  Okay.  So?

22      A.  And that it was in the papers.

23      Q.  Okay.

24      A.  As chief counsel, someone who's supposed to

25   have good judgment, see the big picture and be media

 1    County, correct?

 2        A.   Correct.

 3        Q.   Okay.  In front of you Ms. Aultman has given

 4    you a copy of Plaintiff's 8 which was attached as an

 5    exhibit to Ms. Hampton's deposition.  And you've seen

 6    this e-mail before, correct?

 7        A.   Correct.

 8        Q.   All right.  This is a copy of the e-mail that

 9    Ms. Wiley had sent to you because it was delayed, she

10    had been at the airport in the morning, correct?

11        A.   Uh-huh.  Yes.

12        Q.   And the complaint is not attached to this

13    e-mail, but at the bottom you see the complaint was

14    there.  And in fact, you received a copy of the

15    complaint; is that correct?

16        A.   Correct.

17        Q.   Okay.  And you say at the top of this e-mail

18    "Thank you.  We'll review," and you ask her if she was

19    able to meet with Cathy; is that accurate?

20        A.   Correct.

21        Q.   Accurate recollection of the e-mail exchange

22    between yourself and Ms. Wiley.  Where were you when

23    you were e-mailing with her?

24        A.   I was at home.

25        Q.   You were on vacation then.

1      A.   Yes.

2      Q.   Okay.  But you were in town.

3      A.   Correct.

4      Q.   Okay.  So when you got this complaint from

5   Ms. Wiley at 4:38 p.m. on -- I'm sorry.  Am I looking

6   -- yes, at 4:38 p.m., did you immediately pick up the

7   phone and call Ms. Hampton?

8      A.   No.  I asked Ms. Wiley to go in person and

9   tell Ms. Hampton that she had filed a lawsuit against

10  her former employer.  They were both in the office.

11     Q.   Okay.  But your -- your job as deputy was to

12  tell Ms. Hampton immediately issues that could affect

13  her.  That's what your testimony was earlier.  I wrote

14  it down.  Correct?

15          MS. THOMAS:  Object to form.

16  BY MS. WORTH:

17     Q.   That's your testimony.

18     A.   And I asked LaTonya, because she's the chief

19  counsel and she was in the office in my place while

20  I'm out, and there was an issue related to her, so I

21  asked her to immediately go to Ms. Hampton and tell

22  her the circumstances.

23  BY MS. WORTH:

24     Q.   I understand that.  But you just testified

25  that you're -- even though you're on vacation, even

```
 1        A.  I wanted to make sure that Ms. Hampton knew
 2   that a lawsuit had been filed.  I had gotten the
 3   impression from one of the deputies that people --
 4   that deputies and Ms. Hampton did not know that an
 5   actual complaint had been filed with the court.  And
 6   so I wanted to call Ms. Hampton and make sure that she
 7   knew that.  And I was going to send her the complaint.
 8        Q.  Okay.  All right.  This is an e-mail to Ms.
 9   Hampton from you that was attached as Plaintiff's
10   Exhibit 9 to Ms. Hampton's deposition.  For record
11   purposes, it's City of Atlanta 000209.  It is
12   Wednesday, December 31st, 2014, at 12:09 a.m.  And it
13   is a copy of the lawsuit that Ms. Wiley filed against
14   Henry County, correct?
15        A.  That's correct.
16        Q.  Okay.  And this is a copy of the e-mail that
17   you sent to Ms. Hampton; is that accurate?
18        A.  Yes.
19        Q.  Okay.  And did you speak to Ms. Hampton
20   before or after this was sent?
21        A.  I believe before.
22        Q.  You spoke to her before it was sent.
23        A.  Uh-huh.  Yes.
24        Q.  All right.  So you spoke to her.  And you --
25   start with that conversation again, if you would,
```

Wiley vs City of Atlanta                Kimberly Patrick                12/21/2016

```
 1   please.
 2       A.  I said, "Cathy, I just want to make sure you
 3   understand that LaTonya filed a lawsuit, that it's not
 4   that she was thinking about filing a lawsuit, she has
 5   filed a lawsuit."
 6       Q.  Okay.  And what did Ms. Hampton say?
 7       A.  And she said, "Send me the complaint.  I'll
 8   review it.  We'll all review it.  And when we come
 9   back Monday, we'll have a discussion and talk about
10   it."
11       Q.  Okay.  When you discussed the lawsuit with
12   Ms. Hampton, did you tell her that you felt it was
13   awful what Ms. Wiley had been through?
14       A.  No.
15       Q.  Okay.  But after speaking with you, Ms.
16   Hampton knew that it had been filed, the lawsuit.
17       A.  Yes.
18       Q.  Okay.  How many phone calls did you have with
19   Ms. Hampton on the 31st?
20       A.  Just one.
21       Q.  Do you recall how many conversations Ms.
22   Hampton testified that you had?
23       A.  I do not.
24       Q.  Okay.  When you spoke to Ms. Hampton about
25   Ms. Wiley's lawsuit, did you discuss preparing a
```

Wiley vs City of Atlanta                  Kimberly Patrick                  12/21/2016

1   statement to address any media inquiries?

2       A.  No.

3       Q.  Did you discuss the termination of Ms.

4   Wiley's employment?

5       A.  No.

6       Q.  Were you ever contacted by any media with

7   respect to Ms. Wiley's Henry County lawsuit?

8       A.  Yes.

9       Q.  Who?

10      A.  I don't know the name of the publication.  I

11  think it's called The Court Reporter or something.

12  But they wanted a statement from the law department

13  about the lawsuit.

14      Q.  Were you concerned about internal pressure

15  from within the city because of a whistleblower

16  complaint?

17          MS. THOMAS:  Object to form.

18      A.  No.

19          THE WITNESS:  Sorry.

20      A.  No.  I was concerned that I couldn't trust my

21  Number 2.

22          MS. WORTH:  Can we take a break?

23          MS. THOMAS:  Okay.

24          MS. WORTH:  Thanks.

25          (Recess 2:40-3:05 p.m.)

```
 1              MS. AULTMAN:  That's 17.  Sorry.
 2    BY MS. WORTH:
 3       Q.  Had you all made the decision to terminate
 4    Ms. Wiley on the 5th of January?
 5              MS. THOMAS:  Object to form.
 6       A.  No.  As I said earlier, I thought about the
 7    entire situation over the weekend, before I went to
 8    work, went back to work.  And my issue with LaTonya as
 9    my chief counsel was that I didn't trust her anymore.
10    So I decided over the weekend that I was going to make
11    the recommendation to the city attorney that she be
12    terminated because I have to be able to communicate
13    with my chief counsel, give confidential information
14    to my chief counsel.  And because she kept that
15    information from me for 11 days, I no longer trusted
16    her.
17              And I went in the office.  And I thought long
18    and hard.  It was not an easy decision.  But I knew I
19    had to make that recommendation because I had to work
20    with her every day.  And when I went in, I knew that I
21    was going to make that recommendation.
22    BY MS. WORTH:
23       Q.  Okay.  So you went into Ms. Hampton's office?
24    I mean, where did you go?
25       A.  No.  After our senior meeting that morning,
```

1  Cathy asked that I meet with her and Bob Godfrey in

2  Bob's office.

3      Q.  Okay.

4      A.  And that's when I made the recommendation.

5      Q.  Okay.  All right.  So you wanted to terminate

6  Ms. Wiley because you felt like you couldn't trust her

7  anymore.

8      A.  Correct.  And she did not use good judgment

9  either.

10     Q.  Okay.  And then you called Ms. Wiley into a

11 meeting?

12     A.  Correct.

13     Q.  And you told her her services were no longer

14 needed.

15     A.  That is correct.

16     Q.  And Ms. Wiley asked you whether or not this

17 had anything to do with the Henry County lawsuit.

18     A.  She asked that, yes.

19     Q.  Yes.  And you offered her the opportunity to

20 resign, correct?

21     A.  Yes.  At some point during the conversation,

22 we offered her the opportunity to resign.  And we do

23 that in most cases.

24     Q.  If someone's been fired.

25     A.  Sometimes we do that.

```
 1        Q.  And she said, "No, because I've not done
 2   anything wrong."
 3        A.  I don't remember what she said.
 4        Q.  Okay.  But she did not want to resign.
 5        A.  That's correct.
 6        Q.  Okay.  All right.  And is it true that the
 7   City of Atlanta later fought Ms. Wiley's application
 8   for unemployment on the basis that she had resigned?
 9             MS. THOMAS:  Object to form.
10        A.  I wouldn't know.
11   BY MS. WORTH:
12        Q.  Okay.  At the time that Ms. Wiley spoke to
13   Ms. Hampton on December 30th, she had already sent you
14   a copy of the complaint at 11:24 that morning,
15   correct?
16        A.  She did send me the complaint that morning.
17        Q.  Okay.  And in fact, she had already spoken to
18   you twice, right?
19        A.  I spoke with her that morning, and then we
20   spoke again after she had a conversation with Cathy.
21        Q.  No.  No.  I'm asking you, by the time she
22   spoke to Ms. Hampton in the office at the City of
23   Atlanta on the 30th, she had spoken to you, correct?
24        A.  That morning.
25        Q.  By phone.
```

Wiley vs City of Atlanta                    Kimberly Patrick                    12/21/2016

```
 1        A.   Okay.

 2        Q.   Can you read the date that this article

 3   purports to have been published in the Henry Herald.

 4        A.   Tuesday, December 30th, 2014.

 5        Q.   The same day Ms. Wiley told you an article

 6   had been published.

 7        A.   Yes.

 8        Q.   Thank you.

 9             (Defendant's Exhibit 20 marked.)

10   BY MR. GEVERTZ:

11        Q.   Ms. Patrick, earlier today I believe you were

12   asked the question, is there any evidence other than

13   your testimony that you asked Ms. Wiley about the

14   terms of her departure from Henry County?  Do you

15   recall that question?

16        A.   Yes.

17        Q.   And you said that you believed you had taken

18   notes on her resume?

19        A.   That's correct.

20        Q.   I'll hand you Defendant's Exhibit Number 20.

21   Do you recognize this document?

22        A.   Yes.

23        Q.   What is it?

24        A.   It's LaTonya Wiley's resume with my

25   handwritten notes from her interview.
```

1        Q.   Did you take these handwritten notes while

2   you were interviewing Ms. Wiley?

3        A.   Yes.

4        Q.   Contemporaneously.

5        A.   Yes.

6        Q.   Do you see on here any of the notes that

7   reflect you asking questions to Ms. Wiley about the

8   circumstances of her departure from Henry County?

9        A.   Yes.  On the top left side, there are notes

10   that say "Commissioners terminated her position."  I

11   have "Outside law firms" next to that.  Then I have a

12   "Moving on from situation" and "Looking for new

13   opportunities."

14        Q.   So with that information in hand, can you

15   inform us what questions you asked and what responses

16   Ms. Wiley gave on the topic concerning her departure

17   from Henry County?

18        A.   Right.  I noted on her resume during the

19   interview she stopped working for Henry County in

20   August of 2014.  And so I asked her the circumstances

21   surrounding that departure.  And that's when she

22   explained to me that the commissioners terminated her

23   position and that they decided to go with two outside

24   law firms.

25            I asked her if she agreed with that, and she

```
 1   said, no, she didn't, but it was an amicable split.
 2   She was moving on from the situation, and she was
 3   looking for new opportunities.
 4        At no time did she give me an indication that
 5   she was upset about anything.  And -- and that's why I
 6   asked her, "How do you feel about that?  You've worked
 7   here all of these years, and they've terminated your
 8   position for outside law firms."  That's why I asked
 9   that.
10        And she said, "No.  I'm moving on.  I'm
11   looking for new opportunities."
12        Q.  Ms. Patrick, are you a mind reader?
13        A.  I am not a mind reader.
14        Q.  Are you a fortuneteller?
15        A.  No, I'm not.
16        Q.  Are you able to predict what someone might do
17   in the future?
18        A.  No, I'm not.
19        Q.  In light of Ms. Wiley's responses to those
20   questions, did you have any reason to ask her whether
21   or not she intended to sue Henry County?
22        A.  No.  I took her for her word.  I asked her
23   very direct questions.  She had been at Henry County a
24   long time.  And so with the answers that she gave me,
25   I was confident that she was telling the truth.
```

```
 1   please.
 2       A.   It says "Chief Legal Counsel Skills and
 3   Competency Expectations."
 4       Q.   As a practical matter, what is this document?
 5       A.   This is a document that basically describes
 6   what the skills and expectations should be for a chief
 7   counsel on the aviation practice group.
 8       Q.   It's a job description for the position that
 9   Ms. Wiley applied for?
10       A.   Yes.
11       Q.   It's a job description for the position you
12   hired Ms. Wiley to fill?
13       A.   Yes.
14       Q.   What role, if any, did you play in crafting
15   this document?
16       A.   I don't believe that I had any role, but I
17   was very familiar with it.
18       Q.   So this document has been existence within
19   the aviation department for a good long while; is that
20   right?
21       A.   That's correct.
22       Q.   Well over a decade.
23       A.   Correct.
24       Q.   Now, I believe I heard your testimony was
25   that good judgment appears in this job description.
```

1    Did I mishear you?

2        A.   That is correct.  Yes.

3        Q.   Can you point out which bullet points you

4    contend speak to the criteria that a chief legal

5    counsel for aviation must have and demonstrate good

6    judgment?

7        A.   Bullet point 3 that says "Exercise good

8    judgment on legal and strategic issues."

9            Bullet point 4, "See and think through the

10   big picture of a case, matter, issue or transaction."

11           Bullet point 7, "Proactively identify and

12   anticipate critical legal issues."

13       Q.   Does the -- go ahead.

14       A.   Another bullet point, "Keep City Attorney

15   fully informed of critical developments, deadlines and

16   upcoming events."

17       Q.   Anything on the second page?

18       A.   "Advise and assist" -- "and assist the City

19   Attorney in all aspects of media and community

20   relations as it relates to their subject matter

21   expertise."

22       Q.   Is this job description accurate?  Does it

23   apply to the position that you hired Ms. Wiley for?

24       A.   Absolutely.

25       Q.   And in retrospect, do you believe that Ms.

Wiley vs City of Atlanta               Kimberly Patrick                12/21/2016

```
 1   BY MS. WORTH:
 2       Q.  Did LaTonya Wiley choose to leave her job
 3   from Henry County?
 4       A.  Her testimony has been no.
 5       Q.  At your office in 2014 -- let me actually
 6   backtrack.
 7            Did you write this in anticipation of your
 8   deposition testimony?
 9       A.  Absolutely not.
10       Q.  So did you write this contemporaneous with
11   her interview?
12       A.  Yes.
13       Q.  So if you did, then she told you that she did
14   not intend to leave her job on her own volition.
15            MS. THOMAS:  Object to form.
16       A.  No.  That's not what she said.  She said that
17   she -- her position had been terminated.
18   BY MS. WORTH:
19       Q.  Okay.  Which means that she was not leaving
20   on her own accord.
21       A.  She didn't --
22       Q.  Yes or no?
23       A.  -- she said, "I did not agree with the
24   position that they took, but I'm moving on from the
25   situation, and I'm looking for new opportunities."
```

```
 1   her.
 2           MS. THOMAS:  Object to form.
 3      A.  All I can go on is what she presented to me
 4   in that interview.
 5   BY MS. WORTH:
 6      Q.  Right.  But moving away -- "moving on from
 7   situation" on this resume doesn't in any way reflect
 8   at all anything having to do with whether or not Ms.
 9   Wiley intends to sue her former employer, does it?
10           MS. THOMAS:  Object -- object to form.
11           Kimberly, answer the question if you can.
12      A.  I cannot answer that.  I -- I just -- I
13   can't.
14   BY MS. WORTH:
15      Q.  Because Ms. Wiley never told you whether she
16   intended to sue her former employer --
17      A.  No, she didn't.
18      Q.  -- did she?  She did not.
19           But yet she was honest with you that her
20   situation at Henry County ended in an involuntary
21   manner, correct?
22      A.  She did not use those words.
23      Q.  Okay.  Did she tell you that she enjoyed her
24   employment there?
25      A.  Yes.  During the time that she worked there,
```

Former County Attorney LaTonya Wiley files 'whistleblower' complaint against Henry C...   Page 1 of 3

# Former County Attorney LaTonya Wiley files 'whistleblower' complaint against Henry County Board of Commissioners

Want daily summaries and Breaking News alerts?

By Asia Ashley

Tuesday, December 30, 2014
© Copyright 2015 Henry Herald



Henry County Commissioner Brian Preston

McDONOUGH — While everyone was getting ready for Christmas last week, Henry County Superior Court was preparing a summons for the Henry County Board of Commissioners based on a lawsuit filed by former County Attorney LaTonya Wiley.

Wiley and her attorney filed a complaint against the commissioners Dec. 19 under the Whistleblower Act, which says an employer violates the Whistleblower Protection Act if agency authorities take — or threaten to take — retaliatory personnel action against any employee or applicant for disclosing information.

Wiley declined to comment on the filing and her attorneys, Kimberly Worth and Katy Aultman, both of Thrasher Liss & Smith LLC., did not return calls for comment by press time.

Commissioners voted during an August meeting — with only Chairman Tommy Smith opposed — to eliminate the county attorney position, and instead outsource the county's legal services to Power and Jaugstetter Law Office, and Fincher, Denmark, Williams, & Minnifield LLC.



Henry County Commission Chairman Tommy Smith

Court documents indicate that Commissioner Brian Preston spearheaded the movement, and said at that August meeting that the change was necessary because the "in-house legal department of a single attorney has reached its limit," due to Henry County's population growth.

DEFENDANT'S EXHIBIT
19
Patrick
dH 12-21-16
PENGAD 800-631-6989

http://www.henryherald.com/news/2014/dec/30/former-county-attorney-latonya-wiley-files/   1/5/2015

COA 000059

Former County Attorney LaTonya Wiley files "whistleblower" complaint against Henry C...   Page 2 of 3



Henry County County
Manager Jim Walker

County Manager Jim Walker told the *Henry Herald* that the decision was to better accommodate the county's needs.

"As I recall, the county of 200,000 was being represented by one person," Walker said. "The decision was made in order to get a broader range of attorneys that have expertise in different areas."

Though no real numbers have been determined regarding how much outsourcing legal services will cost the county, Walker said he hopes it will be cost-saving. One of the law firms will be paid a flat monthly fee, and the other will be paid at an hourly rate based on the work, he added.

Smith said the executive session that addressed the matter at the Aug. 19 meeting blindsided him because he saw no need to rid of Wiley's position, adding that she had done well at managing the county's caseload.

"It was kept a secret from me," said Smith. "It was not aware to me until we went into executive session. It was already pre-determined (by the board). You can talk to any of the judges and they'll tell you she has an impeccable record."

Smith said it seemed more logical to have kept legal services in-house because of the convenience of location, which made for better access and communication. He added that the decision could not have been made under the pretext of saving money because no one knows how much money the county will save.

According to court documents, Wiley alleges that Preston's move toward doing away with the county attorney position was influenced by personal issues.

The document references an incident in which Wiley began defending an appeal in January 2013 on behalf of the Board of Tax Assessors filed by the largest ad valorem taxpayer in Henry County. The suit does not identify the individual by name but purports them to be the largest taxpayer in the county, of which Wiley said were friends or business associates of Preston.

Wiley alleges that Preston repeatedly tried to influence her to settle the case in the favor of the property holder, but she refused to let his pressure affect her work.

A similar incident arose in March when Smith asked Wiley to review the county's arrangement with its insurance broker, which costs the county $13 million annually. Wiley presented her findings to the commissioners and found that there were several options that would result in a lower brokerage fee. The court document stated that Preston "angrily confronted Ms. Wiley and chastised her for spending too much time on the insurance matter," and that she should have "stayed out of it."

COA 000060

The document alleges that Preston has close ties with the county's insurance broker and the two have maintained the same business location for years.

Several other incidents in which Preston seemed in conflict with Wiley were referenced throughout the document. Preston declined to comment on the suit.

The complaint demands a jury trial to settle the case and suggests that if reinstatement of Wiley's position is not possible, that Wiley receives three years of front pay, including any fringe benefits and any loss of retirement income, compensatory damages for the diminished earning capacity, humiliation, pain and suffering; She is also seeking compensation for attorney fees and costs, and other relief the court deems appropriate.

If her position is reinstated, her attorneys are asking for back pay and the same benefits that she had prior to her termination.

## Sponsored From Around the Web



Secret Brain Pill
Billionaires Are
Using



U S Presidents
Ranked from Worst
to Best



How to Lose 20lbs
of Belly Fat in a
Month?



Easiest Way to
Remove Wrinkles



What Happens
When You Take a
Testosterone
Supplement

COA 000061

*[handwritten annotations: "Person of Integrity  Media experience  (Chief Counsel?)", "Workaholic  Know Robert's Rules", "Passionate  └ Parliamentarian", "Commissioners terminated her position - outside law firm", "Moving on for a situation, or looking for a Appel -"]*

# LATONYA NIX WILEY *[handwritten: — Sr. Asc. City Atty]*

413 Preakness Lane · McDonough, Georgia 30252 · wileylaw@aol.com · (678) 614-1921

## PUBLIC SECTOR/LOCAL GOVERNMENT ATTORNEY

**Government/Management Relations**          **Risk Management/Analysis**          **EEO Training/Development**

### PROFILE

Highly accomplished attorney with significant in-house experience in providing legal representation to public officials and executive management in all areas of government operations, to include personnel management, policy development and risk-management analyses. Proven record of accomplishment in providing sound litigation avoidance strategies and practical problem-solving solutions.

### PROFESSIONAL EXPERIENCE

**County Attorney**
**Henry County, Georgia**                         **12/2009- 08/2014**
**McDonough, Georgia**

*[handwritten: 6 commissioners, — worked w/ Legal A., 2 Paralegals]*

*Responsible for oversight and management of legal service delivery to Henry County government and its component units.*

Managed all legal claims involving the County and its elected and appointed officials. Supervised legal staff. Managed cases assigned to outside counsel. Coordinated with insurance defense counsel on covered claims. Conducted trials in ad valorem tax appeals, condemnation cases, rezoning actions, injunctive relief and mandamus actions, certiorari proceedings and nuisance abatement proceedings. Prosecuted County ordinance violations in Magistrate Court. Represented the County and elected officials in State appellate courts, federal district and bankruptcy courts.

*[handwritten margin notes: "In-House", "3d-party", "cases dad", "ordinance violation"]*

Handled administrative claims before the EEOC based on race, age, sex and disability. Handled administrative claims before the United States Department of Justice and State Attorney General's Office. Prepared pre-clearance submissions to Department of Justice pursuant to the Voting Rights Act.

Provided routine consultation and advice to County Commissioners, Tax Commissioner, Superior Court Judges, State Court Judges, Superior Court Clerk, State Court Clerk, Probate Judge, Sheriff, Election Superintendent, and Board of Tax Assessors.

Worked cooperatively with component units of local government, their executive officials and counsel: Henry County Water Authority; Henry County Development Authority; Henry County Hospital Authority; Henry County Board of Education; and local municipalities.

Drafted intergovernmental agreements, local legislation enacted by the Georgia General Assembly, and local ordinances, including County personnel ordinance.

**Key Achievements/Responsibilities:**
- ➤ Oversaw 2013 Special Local Option Sales Tax ("SPLOST") referendum process;
- ➤ Handled 2012 Local Option Sales Tax ("LOST") negotiations process involving the County and its four (4) municipalities.
- ➤ Responsible for successful completion of 2012 Redistricting  Submission to Department of Justice.
- ➤ Negotiated the 2011 acquisition and purchase of Tara Field Airport from Clayton County and coordinated with GDOT aviation officials and FAA regarding the same.
- ➤ Negotiated 2009 Service Delivery Strategy Agreement.
- ➤ Served as local bond counsel on more than $500 million in bond issuances.

*[handwritten: "Clayton Co  O dned  airport  located  in Henry"]*

DEFENDANT'S EXHIBIT 20  Patrick  1.14  12-21-16  PENGAD 800-631-6989

COA 000068

**Deputy County Attorney.**
**Henry County, Georgia**                                    **04/2004-12/2009**
**McDonough, Georgia**

*Served as second highest ranked in-house counsel for third fastest growing county in the United States.*

Under direction and supervision of County Attorney. Responsible for counseling key management and elected officials on personnel issues affecting a 1,500+ member workforce. Worked closely with all levels of management to develop, coordinate and implement personnel policies and procedures designed to prevent and/or minimize legal risks associated with personnel. Managed all labor and employment litigation. Prepared all responses submitted to EEOC. Coordinated litigation assigned to insurance defense counsel and facilitated appropriate interaction with management and personnel to ensure maximum representation of County's interests.

**Key Achievements/Responsibilities:**
➢ Initiated comprehensive review and revision of County's 12-year old personnel policy ordinance.
➢ Revamped job classifications in a manner consistent with the Fair Labor Standards Act.
➢ Created an expansive anti-harassment work policy with a more definitive and stream-lined reporting procedure to ensure effective response and managerial oversight.
➢ Established a legally viable drug testing policy applicable to all County employees.
➢ Influenced and oversaw the implementation of routine mandatory EEO training for managerial and supervisory personnel.
➢ Improved method by which FMLA requests were handled by devising practical and relevant internal procedures for use by management officials.
➢ Collaborated with elected officials (e.g., Sheriff; Solicitor General; Clerk of Court; and Judicial Officers) concerning personnel issues.
➢ Conducted investigations of matters having potentially significant legal impact to County and provided risk analysis assessments to Board of Commissioners concerning such matters.
➢ Coordinated strategies to assist management in effectively dealing with legal claims arising from policy decisions.

**Litigation Associate.**
**Edwards & Youmas, LLC.**                                    **09/1993–2/2004**
**Macon, Georgia**

Successfully represented individuals in employment related claims arising from breach of contract, defamation, workers' compensation, fraud, retaliation, wrongful termination, sexual harassment, race, age, gender and disability discrimination and the Family and Medical Leave Act. Counseled corporate clients regarding personnel policies, Title VII and ADA issues, and FLSA compliance and provided proactive advice concerning hiring, disciplining and termination decisions. Successfully pursued employment claims in federal court on behalf of aggrieved plaintiffs. Extensive experience representing individuals in administrative forums such as the EEOC and in arbitration proceedings held pursuant to collective-bargaining agreements. Prepared and conducted sexual harassment training seminar for major hierarchical religious organization. Employment counsel for three local governmental entities providing routine employment related advice and litigation counseling.

## EDUCATION

Juris Doctorate; **Walter F. George School of Law, Mercer University** Macon, Georgia.

**Bachelor of English; Bachelor of Philosophy;** Emory University Atlanta, Georgia.

## Chief Legal Counsel
## Skills and Competency Expectations

A Chief Legal Counsel's primary role is to provide counsel to the City Attorney on legal matters that involve specific subject matter expertise, including but not limited to: employment, litigation, procurement, real estate, transactional and legislative matters.  Chief Legal Counsel also serves as the primary advisor for legal issues in his/her area of expertise arising within the Law Department, within other City departments or within City Council as directed or delegated by the City Attorney.

### *General Practice Skills*

- Demonstrate strong technical, persuasive and polished writing and speaking ability.

- Have direct client contact on complex and policy level issues and advice.

- Exercise good judgment on legal and strategic issues.

- See and think through the big picture of a case, matter, issue or transaction.

- Ensure that all critical deadlines are met.

- Delegate and supervise work effectively as appropriate.

- Proactively identify and anticipate critical legal issues, assign legal research as appropriate, review junior lawyer work product and advise the City Attorney of pertinent legal issues.

- As directed or delegated by the City Attorney advise City departments and the City Council on pertinent legal issues

- Keep City Attorney fully informed of critical developments, deadlines and upcoming events.

- Keep abreast of new developments in their subject matter field.

### *Specific Chief Counsel Skills:*

- Supervise caseload, including all litigation involving the City related to their respective subject matter expertise.



COA 000552

- Provide advice and counsel on transactional and legislative matters related to their respective subject matter expertise.
- Be proficient in subject matter expertise.
- Advise City Departments, City Council, and City Boards and Commissions on a variety of legal matters including the legal implications of any action, inaction, or decision.
- Prepare, review, and examine contracts, agreements, briefs, bid protests, dispute resolutions, change orders, delay claims, ordinances, and other legal documents for City departments.
- Assist in legislative development for the City including proposed ordinances, resolutions, policies, and other legislation related to their respective subject matter expertise.
- Perform legal research and provide legal opinions related to subject matter expertise for the City Attorney as assigned.
- Respond to internal inquiries regarding various legal issues concerning City business.
- Prepare and present training for City Departments in area of subject matter expertise.
- Attend and participate in professional groups to stay abreast of new trends and innovations in the specific subject matter fields.
- Advise and assist the City Attorney in all aspects of media and community relations as it relates to their subject matter expertise.
- Consistently provide reliable and sound advice, recommendations and judgment to the City Attorney as a sounding board.
- Be available to provide assistance to the City Attorney at any time the need may arise, recognizing that the City operates on a 24 hours a day, 7 days a week schedule.
- Performs related duties as required.

**_Knowledge base :_**

To the extent applicable to the specific area of expertise, the Chief Counsel should be abreast of:

- Legal principles, practices, and procedures of civil, constitutional, and administrative law.
- Public finance, taxation and bonds.
- Public Utilities.
- Public Elections and Redistricting.
- Public Safety Law and Practice.
- General and public contract law.
- Methods and techniques of legal research.
- Litigation strategies.

- Duties, powers, and limitations of a city government.
- Appellate practices.
- Judicial procedures and rules of evidence.
- Pertinent federal, state, and local laws, codes, and regulations.

### *Professional Knowledge Development*

- Actively participate in the development of others, including more junior lawyers, by presenting topics at Department, sub-group or practice group meetings, particularly in the area of subject matter expertise.
- Be available for and provide consultation to other attorneys and staff within the department on matters related to his/her specific area of expertise.
- Speak on subject matter expertise at CLE seminars and participate in other community or legal events to enhance the Department's reputation in the legal community.

### *Interpersonal Skills*

- Provide prompt and direct feedback on work done by junior lawyers.

- Work closely with the City Attorney, updating him/her on the status of cases, matters or transactions and discussing issues related to subject matter expertise in the City, Department or practice group.

### *Department and Community Activities*

- Be actively involved in activities such as development and delivery of client and community training and relationship development.

- Be actively involved in activities in the Department and the City and display leadership roles in those activities.

### *Professional Work Habits*

- Be fully committed to and supportive of the Department, its policies and processes, especially the more junior attorneys and the staff. Set a good example for others.

- Be known in the legal community as an example of the quality and leadership of the City of Atlanta Law Department.