IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LATONYA NIX WILEY,                    :
                                      :
                    Plaintiff,        :
                                      :        CIVIL ACTION NO.
vs.                                   :
                                      :        1:16-CV-0031-CC
CITY OF ATLANTA, GEORGIA,             :
                                      :
                    Defendant.        :
                                      :

## OPINION AND ORDER

This lawsuit, which was brought by Plaintiff Latonya Wiley ("Plaintiff" or "Ms. Wiley") against Defendant City of Atlanta, Georgia ("Defendant," the "City of Atlanta," or the "City"), is before the Court on Defendant's Motion for Summary Judgment [Doc. No. 51]. For the reasons stated below, the Court denies Defendant's Motion for Summary Judgment.

## I.   FACTS

### A.   Plaintiff's Termination from Henry County and Initial Consideration of Legal Options

Plaintiff was employed as County Attorney of Henry County, Georgia, from approximately December 2009 through early September 2014. (Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment "DSMF" [Doc. No. 52] ¶ 1.) In this role, Plaintiff reported directly to Henry County's Board of Commissioners. (Id. ¶ 2.) On or about August 19, 2014, the Henry County Board of Commissioners voted to abolish the Henry County Legal Department, including Plaintiff's position, and retain outside counsel to provide legal services going forward. (Id. ¶ 3.) Accordingly, Plaintiff's employment was terminated effective September 2, 2014. (Id. ¶ 4.)

Plaintiff allegedly suffered humiliation and emotional distress as a result of the termination of her Henry County employment. (Id. ¶ 5.) She contends that the Board's decision was an act of retaliation against her for having resisted and

reported corrupt conduct of several of its current and former members.  (Id. ¶ 6.) Shortly after the Board's decision to eliminate her position, Plaintiff considered speaking to legal counsel to obtain advice on her options and whether there were grounds to file a lawsuit against Henry County with respect to her termination.  (Id. ¶ 7; Deposition of Latonya Nix Wiley "Wiley Dep." [Doc. No. 60] at 55:10-19.) Plaintiff contacted attorney Kimberly Worth on August 29, 2014, to obtain legal advice.  (DSMF ¶ 8.)  On September 12, 2014, she formally retained Worth to represent her.  (Id.)  Within days after her termination from Henry County and prior to retaining legal counsel, Plaintiff contacted the Corruption Unit of the Federal Bureau of Investigation to report the unlawful activities in Henry County government which precipitated her termination, but nothing happened after her initial report.  (Plaintiff LaTonya Wiley's Statement of Material Facts as to Which There is an Issue to be Tried "PSMF" [Doc. No. 66-1] ¶ 51.)

B.     Plaintiff's Pursuit of Legal Positions with City of Atlanta

On or about September 19, 2014, Plaintiff applied for two open positions with the Aviation Division of the City of Atlanta's Law Department – Senior Assistant City Attorney and Chief Counsel.  (DSMF ¶ 9.)  On October 2, 2014, Plaintiff interviewed with Deputy City Attorney of Aviation Kimberly Patrick ("Patrick"). (Id. ¶ 10.)  As Deputy City Attorney of Aviation, Patrick oversees the entire legal team dedicated to the City's airport.  (Id. ¶ 11.)  She reports directly to Cathy Hampton ("Hampton"), the City Attorney.  (Id.)

Prior to interviewing Plaintiff, Patrick instructed a member of her staff, Vernedia Baldwin ("Baldwin"), to do some basic background research on Plaintiff. (PSMF ¶ 5.) Baldwin's regular responsibilities included conducting Google searches of individuals and issues relevant to the airport.  (Id. ¶ 6.)  During her deposition, Patrick was unable to recall any specific information that Baldwin identified about Plaintiff in her background search prior to Patrick's interview of Plaintiff.  (Id. ¶ 7.)

Patrick initially interviewed Plaintiff for the Senior Assistant City Attorney position. (DSMF ¶ 12.) During that initial interview, Patrick determined that Plaintiff's skills and experience qualified her for the more senior Chief Counsel position. (Id. ¶ 13.) Patrick asked Plaintiff about the work that she had done as Henry County Attorney and its relevance to the job of Chief Counsel in the City's Law Department. (PSMF ¶ 8.) Patrick placed Plaintiff into primary consideration for the Chief Counsel role. (DSMF ¶ 13.)

Patrick recalls asking Plaintiff, during the interview, about the termination of her employment from Henry County. (Id. ¶ 14.) According to Patrick, Plaintiff informed her that her position had been eliminated and that the Board of Commissioners had decided to bring in two outside law firms to handle her work. (Id. ¶ 15.) Patrick further recalls that Plaintiff "relayed all of that to [her] as if it was amicable, there was no issue there, that they were just bringing them in to do her work, and she was moving on to the next opportunity." (Deposition of Kimberly Patrick "Patrick Dep." [Doc. No. 58] at 98:5-8.) Patrick testified that Plaintiff never gave her an indication that she was upset about anything. (Id. at 162:4-5.)

When deposed, Plaintiff specifically could not and did not deny that the topic of her departure from Henry County came up, but she testified emphatically that she did not recall having a discussion with Patrick about why she left Henry County or being asked a question about that subject. (Wiley Dep. at 84:13-87:25.) In a declaration in support of her Response to Defendant's Motion for Summary Judgment, Plaintiff attests that "Patrick never asked me why I left Henry County after decades of employment, or about the circumstances of my departure." (Declaration of LaTonya Wiley "Wiley Decl." [Doc. No. 66-4] ¶ 16.) Plaintiff also attests in her declaration that she never stated to Patrick that her separation from Henry County was amicable or that she was "moving on from the situation." (Wiley Decl. ¶ 17.)

Approximately ten days later, on October 13, 2014, Plaintiff underwent a

second round of interviews with other attorneys within the City's Law Department, including City Attorney Hampton. (DSMF ¶ 18.)  Hampton testified that she could not recall what she was told specifically regarding Ms. Wiley prior to interviewing her. (PSMF ¶ 10.)  During Hampton's interview of Plaintiff, the two discussed the events leading up to her departure from Henry County.  (DSMF ¶ 19; Wiley Dep. at 89:6-13.) According to Hampton, Plaintiff told her: "They're changing the method of legal services in Henry County.  We're having an amicable - - it's amicable, but they're now going to outsource the function."  (Deposition of Cathy Hampton "Hampton Dep." [Doc. No. 59] at 110:11-14.) Plaintiff, on the other hand, recalls that she told Hampton that there were commissioners in Henry County who wanted her to do things that she was not comfortable with.  (Wiley Dep. at 89:22-24.)  In her declaration, Plaintiff attests that the term "amicable" never came up once during her interview with Hampton. (Wiley Decl. ¶ 21.)  She further attests that she told Hampton that she "had been pressured to take actions [she] felt were unethical and, after decades of employment, [her] position was abruptly eliminated."  (Id. ¶ 22.) At no point during her interview with Hampton did Plaintiff inform Hampton that she felt she had been treated unlawfully by her former employer or that she was contemplating taking legal action against it. (DSMF ¶ 21.) However, Plaintiff attests that Hampton did not ask her whether she felt that she had been terminated unlawfully or whether she was considering legal action.  (Wiley Decl. ¶¶ 19, 21.)

None of the other City of Atlanta employees who interviewed Plaintiff asked about the reason for her departure from Henry County.  (PSMF ¶ 20.)  None of the City of Atlanta officials or employees who interviewed Plaintiff indicated that she was required to provide additional information regarding her termination from Henry County or that she was required to notify the City of Atlanta that she had retained counsel to investigate her Henry County termination.  (Id. ¶ 21.)

Plaintiff provided the name and address of Chairman Tommy Smith of the Henry County Board of Commissioners as one of her references when she applied

for the position with the City of Atlanta. (<u>Id.</u> ¶ 22.) However, Patrick did not call to check Plaintiff's references or speak to anyone associated with Henry County to discuss the circumstances of her departure. (<u>Id.</u>) Hampton also did not speak to any of Plaintiff's references or contact any of the Henry County commissioners to inquire into her departure from her employment. (<u>Id.</u> ¶ 23.)

C.    <u>Plaintiff's Job Offer and Employment with City of Atlanta</u>

In or around early November 2014, Patrick called Plaintiff and offered her the Chief Counsel position. During this conversation, Plaintiff did not disclose the possibility that she might soon be suing her former employer, (DSMF ¶ 23), and Plaintiff attests that she had not decided at that time whether to proceed with a lawsuit against Henry County, (Wiley Decl. ¶ 29). On November 10, 2014, Plaintiff signed an offer letter, officially accepting the position of Chief Counsel. (DSMF ¶ 24.)

Plaintiff began work on December 4, 2014. (<u>Id.</u> ¶ 25.) Plaintiff reported directly to Deputy City Attorney Patrick, who handled all legal functions related to the world's busiest airport. (<u>Id.</u> ¶ 27.) As of her first day at the City of Atlanta, Plaintiff had not made the decision to file a lawsuit against Henry County, as she was concerned about her ability to afford the associated expenses. (PSMF ¶ 24.)

After Plaintiff began her employment as Chief Counsel in the Law Department's Aviation Division, she was not given a job description or any written listing of expected duties and responsibilities. (<u>Id.</u> ¶ 25.) The job posting to which Plaintiff applied for the position of Chief Counsel was the only written job description that Plaintiff received from the City of Atlanta. (<u>Id.</u> ¶ 26.) The job posting for the Chief Counsel position did not include any explicit reference to interaction with the media or keeping up with the news. (<u>Id.</u> ¶ 27.) Patrick did not speak to Plaintiff during her employment at the City of Atlanta about any process or procedure for identifying issues at the airport that could become the subject of media attention, in large part because the communications department handles this

type of thing.  (Id. ¶ 28.)  Plaintiff was not involved in responding to any issues involving the media during her short employment at the City of Atlanta, so she did not have the opportunity to observe the process or procedure regarding such matters.  (Id. ¶ 29.)

The Chief Counsel position encompassed a variety of duties and responsibilities. (DSMF ¶ 26.) The parties disagree, however, regarding the nature of those duties.  According to Defendant, Patrick charged Plaintiff with acting as the liaison between the legal team and Patrick with respect to daily operations at the airport, keeping Patrick informed of any and all important legal issues or problems as they arose.  (Id. ¶ 28.)  Defendant also states that Patrick tasked Plaintiff with identifying problems or issues that could become subjects of media attention and notifying Patrick of the same.  (Id. ¶ 29.)

Wiley testified that she was responsible for acting as a liaison to Patrick with respect to six other attorneys in the Aviation Division to "coordinate and make certain that those individuals had the appropriate training they need, to be on top of where they were in their calendars and things that were going on." (Wiley Dep. at 162:22-163:9.)  In her declaration, Wiley attests that Patrick remained directly involved in the day-to-day operations of the Aviation Division. (Wiley Decl. ¶ 27.) Wiley denies having been responsible for identifying or addressing problems or issues that become subjects of media attention and attests that the City and the airport have their own public relations staff who work directly with the media. (Id. ¶ 28.)  At no time did Plaintiff deal with the media during her short time with the City of Atlanta.  (PSMF ¶ 35.)

Good judgment is a key component of the Chief Counsel position.  (DSMF ¶ 32.)  The job description for the Chief Counsel position provides that the person in the position is expected to do the following, among other things:

- Have direct client contact on complex and policy level issues and advice.
- Exercise good judgment on legal and strategic issues.

- See and think through the big picture of a case, matter, issue or transaction. . . .
- Delegate and supervise work effectively as appropriate.
- Proactively identify and anticipate critical legal issues, assign legal research as appropriate, review junior lawyer work product and advise the City Attorney of pertinent legal issues.
. . .
- Keep City Attorney fully informed of critical developments, deadlines and upcoming events.
. . .
- Advise and assist the City Attorney in all aspects of media and community relations as it relates to their subject matter expertise.
- Consistently provide reliable and sound advice, recommendations and judgment to the City Attorney as a sounding board.
-

(Patrick Dep., Ex. 21.)  Wiley attests that she was never presented with this job description during her employment at the City of Atlanta.  (Wiley Decl. ¶ 26.) Defendant appears to concede that Wiley never received this job description.

Patrick testified that her personal job responsibilities, as Deputy City Attorney of Aviation, included keeping the City Attorney informed of legal issues related to the airport, including issues related to such matters as security, concessions, and anything that could potentially become a news story related to the airport.  (PSMF ¶ 30.)  Patrick testified that she reviews the results of Google alerts and would notify Hampton of any articles that she thinks are important.  (Id. ¶ 32.)

Patrick further testified that the Department of Law was not responsible for issuing press releases and relied on the City's communications department to handle the press.  (Id. ¶ 33.)  Patrick testified that, in her 20 years of service with the City of Atlanta Department of Law, she has provided information to the communications department for a press release between 10 to 20 times.  (Id.)  In the instances when Patrick involved herself in matters involving the media, it was simply to provide information to the City of Atlanta's communications department.  (Id. ¶ 34.)

D.   Plaintiff's Further Consideration of Legal Action Against Former Employer

After Plaintiff started her employment with the City of Atlanta, she had a limited amount of time to decide whether to proceed with filing a whistleblower

lawsuit against Henry County due to a potential statute of limitations issue uncovered by her legal counsel.  (PSMF ¶ 39.)  Plaintiff considered several factors prior to filing the lawsuit, including the general challenges and hardship involved in employment litigation, that the corruption she had opposed in Henry County was ongoing but she no longer had any influence over it since she had been removed as County Attorney, and that she felt strongly as a citizen of Henry County that the corrupt activities within Henry County government should not be allowed to continue.  (Id. ¶ 40.)  Plaintiff also was concerned about the costs and expenses associated with filing a lawsuit against Henry County, as she had not been employed for some time.  (Id. ¶ 42.)

Plaintiff testified with respect to her decision to proceed with filing suit: "[I]t would have been easy to do nothing.  That was the easy way out.  I took the more difficult and more challenging route and stood up for what I – I made a personal decision, and I decided to move forward."  (Id. ¶ 43 (quoting Wiley Dep. at 68:2-6).)  Regarding her motivation in filing suit against Henry County, Plaintiff testified:

> Well, I was motivated principally because there was a need to expose the corruption that I was subjected to and retaliated against for not participating in.  And I felt the need to expose that.  It was wrong, it was illegal, and I made a very difficult decision.

(Id. ¶ 44 (quoting Wiley Dep. at 61:2-7).)  When asked what she hoped to accomplish in filing her Henry County Complaint, Plaintiff testified:

> I hoped to accomplish exposing the corrupt activities, the illegal activities I was being asked to participate in, and was retaliated against for not participating in.  That was my main accomplishment.
>
> By the time the lawsuit was filed, I had already started working for the City of Atlanta.  And so I weighed a lot of things – I weighed a lot of things.
>
> And again, I felt that it was important, as a citizen of Henry County, a taxpayer in Henry County, as a public official in Henry County, that those things be made public, and that they not – that the [sic] be exposed and brought to light.

(PSMF ¶ 45 (quoting Wiley Dep. at 61:10-23).)

E.   <u>Plaintiff's Lawsuit Against Former Employer</u>

On December 19, 2014, fifteen days into her employment with the City of Atlanta, Plaintiff filed a lawsuit in the Superior Court of Henry County against Henry County and its Board of Commissioners (the "Henry County Suit"). (PSMF ¶ 46.) If Plaintiff had not filed the Henry County Suit when she did, her statute of limitations would have passed. (<u>Id.</u> ¶ 52.)

In the Henry County Suit Complaint, Plaintiff alleges that she was unlawfully terminated in violation of the Georgia Whistleblower Act, O.C.G.A. § 45-1-4, <u>et seq.</u> (the "GWA"). (DSMF ¶ 36.) Plaintiff alleges further that she suffered mistreatment and retaliation from several Board Commissioners during her tenure as County Attorney after resisting and/or reporting a variety of allegedly corrupt and unlawful acts they committed, including corruption and unlawful pressure by Commissioner Brian Preston on Plaintiff to influence an appeal on behalf of the largest ad valorem taxpayer in Henry County and another instance of threats and pressure by Commissioner Preston on Plaintiff to discourage her from investigating the County's no-bid contract with its insurance broker with whom Commissioner Preston has close personal ties. (DSMF ¶ 37; PSMF ¶ 46.) Plaintiff alleges that these corrupt and unlawful activities started as early as mid-2012. (DSMF ¶ 38.) Plaintiff further alleges that these retaliatory acts culminated in the Board's vote to eliminate her position in August 2014 in retaliation for her "refusal to participate in and disclosure of the ongoing fraud, waste, and abuse in County government." (<u>Id.</u> ¶ 39 (quoting Henry County Suit Complaint ¶ 37).) Plaintiff also alleges that following her termination, several of the Commissioners "continued to make derogatory statements about [her] performance as County Attorney," which "harmed Ms. Wiley in her professional capacity." (DSMF ¶ 40 (quoting Henry County Suit Complaint ¶¶ 49-50).)

The ad valorem tax appeal reference in the Henry County Suit Complaint represented a significant revenue basis for Henry County government, which would

be redistributed among the citizens of Henry County if settled for less than the fair market value of the property.  (PSMF ¶ 47.)  Plaintiff testified:

> If I had thrown a hundred-million-dollar tax appeal case, and the county received less ad valorem taxes than was legally required to be received, that money would never have made it into the general fund coffers.
>
> Someone would have had to make that up – one of the other 82,999 property owners in that county.  That burden would have been shared among the public at large, which is why you're not allowed to show favoritism or favorites when it comes to assessing property.
>
> It is a clean process.  It affects every taxpayer in Henry County.  And if you start cutting favors for one property owner, that burden shifts to the other property owners.  That's a fact.
>
> Sixty percent of the county's revenues come from ad valorem taxes.  And when you start making distinctions based upon improper motives, to help my friend, or cut someone a break because I know this person, they're my friend, that has a direct impact on the public.
>
> It was not about me.  I did not stand to benefit.  If I had done what was asked of me, and given Atlanta Motor Speedway a break, and agreed to settle the case for $50 million less than it was supposed to be valued at, that doesn't affect me personally, other than – if we're going to shift it, I'm in the same situation as every other taxpayer in Henry County.

(Id. (quoting Wiley Dep. at 155:10-156:13).)  The no-bid, non-negotiated contract with the insurance broker referenced in Ms. Wiley's Henry County Suit Complaint costs Henry County taxpayers hundreds of thousands of dollars in commissions without any significant identifiable services from the broker.  (PSMF ¶ 50.)

Plaintiff's Henry County Suit Complaint seeks:  "[r]einstatement with back pay and such benefits as Ms. Wiley would have enjoyed had she never been terminated"; "[i]f reinstatement is deemed inappropriate under the circumstances, compensation for Ms. Wiley with three years of front pay, including any fringe benefits and any loss of retirement income"; "compensatory damages . . . for the diminished future earning capacity, mental anguish, humiliation, pain and suffering"; and "attorneys' fees and costs".  (DSMF ¶ 41 (quoting Henry County Suit Complaint at Prayer for Relief).)

F.     Plaintiff's Disclosure of Lawsuit to Patrick and Hampton

On or about Monday, December 29, 2014, Plaintiff received a call from the local media inquiring about the Henry County Suit and seeking a comment. (DSMF ¶ 43; PSMF ¶ 55.) Prompted by notice that her lawsuit was news, Plaintiff decided that it was the right time to inform the City of its existence. (Wiley Dep. at 128:2-131:5.) She had planned to inform Patrick of her lawsuit without respect to the phone call from the Henry County reporter. (Id.) Even though the City of Atlanta had no policy requiring employees to report outside lawsuits, Plaintiff wanted to notify Patrick first of the Henry County Suit in an effort to follow her chain of command. (PSMF ¶ 56.) Plaintiff intended to speak to Patrick about the Henry County Suit later, but in light of the phone call from the reporter, Plaintiff decided to tell Patrick about the lawsuit the next day, December 30, 2014, even though Patrick was on vacation. (Id. ¶ 57; DSMF ¶ 45.)

Between the filing of the Henry County Suit on December 19, 2014, and Plaintiff's first conversation with Patrick about the whistleblower action, there were only four (4) working days because the City of Atlanta was closed for the Christmas holidays. (PSMF ¶ 58.) On the morning of December 30, 2014, Plaintiff notified Patrick by phone that she had filed a whistleblower lawsuit against Henry County. (Id. ¶ 59.) During that phone call, Plaintiff provided background information regarding allegations from the Henry County Suit. (PSMF ¶ 60.) Patrick recalls that Plaintiff told her news of the lawsuit was already in the papers. (Patrick Dep. at 130:19-22.) Plaintiff recalls explaining to Patrick only that she had received a call from a local Henry County reporter about an article to be posted in the paper the next day. (Wiley Decl. ¶¶ 38-40; PSMF ¶ 61.) The online version of the article has a publication date of December 30, 2014, the day of this conversation. (DSMF ¶ 45 n.3.) Patrick did not tell Plaintiff during their phone call on the morning of December 30, 2014, that her job was in danger. (PSMF ¶ 62.)

Patrick asked Plaintiff to send her a copy of the Complaint, which Plaintiff

did.  (DSMF ¶ 46; PSMF ¶ 59.)   After reviewing its contents, Patrick spoke with Plaintiff again by phone.  (DSMF ¶ 46; PSMF ¶ 64.)   During one of the phone calls between Patrick and Plaintiff that day, Patrick expressed sympathy in response to Plaintiff's representation that she had received threats.  (PSMF ¶ 64, 66.)   Plaintiff testified that, during their second phone call, Patrick told her, "This is awful." (PSMF ¶ 65, 66.)  Patrick never told Plaintiff during these conversations that her job was in danger.  (Id. ¶ 64.)

At the time of these conversations, Patrick was out of the office on vacation, which had started a few days before Christmas and would go through the end of the year.  (DSMF ¶ 46; PSMF ¶ 53.)  Regarding her conversations with Plaintiff, Patrick testified as follows:

> I was trying to take it all in.  It wasn't about me being sympathetic, kind, angry.  This was a huge blow.  This was my chief counsel for the world's busiest and most efficient airport telling me that she had not told me that she filed a lawsuit for 11 days.  And we saw each other. We talked.  We e-mailed.  And so I was in shock.  That's how I would describe myself.  I was in shock.  And it was the beginning of me saying I can't trust this person.  I was in shock.

(Patrick Dep. at 130:7-15.)

Plaintiff recalls that Patrick was appreciative of being informed and thanked Plaintiff for telling her before the case came out in the news.  (Wiley Dep. at 129:13-21; Wiley Decl. ¶ 40.)  According to Plaintiff, Patrick did not ask her why she had not told her about the lawsuit previously and did not inform Plaintiff that her job was in jeopardy, (Wiley Decl. ¶ 40), but Patrick testified that she did ask Plaintiff why she did not tell her about the lawsuit, (Patrick Dep. at 128:1-2).  Patrick did tell Plaintiff, according to Plaintiff's testimony, that Hampton was not going to like the fact that Plaintiff filed the Henry County Suit, because Hampton had been the subject of a whistleblower lawsuit herself.  (PSMF ¶ 91; Wiley Dep. at 189:4-7.) Patrick maintains that she did not make any representations regarding whether Hampton would be upset.  (Patrick Dep. at 74:15-22.)

During their second conversation on December 30, 2014, Plaintiff asked

Patrick whether she should contact Hampton immediately or wait for Patrick to meet with Hampton first to discuss the Henry County Suit. (PSMF ¶ 68.)  Patrick directed Plaintiff to talk to Hampton and let her know about the lawsuit.  (Wiley Dep. at 173:10-16.) Following this discussion, Plaintiff sought out Hampton that day to personally inform Hampton of her pending lawsuit in Henry County.  (PSMF ¶ 68.)

Later that day, Hampton stopped by Plaintiff's office, and the two spoke briefly.  (DSMF ¶ 51.)  Plaintiff told Hampton that she had filed suit against Henry County.  (Id. ¶ 52.)  Hampton responded by saying that she did not have time or energy to talk about it at that time, but that Plaintiff should schedule time with her the following week, after the New Year's holiday, to discuss it in more detail.  (Id. ¶ 53; PSMF ¶ 70, 71.)  According to Plaintiff, Hampton also advised her that she should "[b]e prepared to explain how and whether [the lawsuit] would impact the city, or the mayor . . . [a]nd if there is such an impact, we may have to look at you taking a leave of absence as opposed to staying."   (Wiley Dep. at 175:7-13.) Defendant, relying on Hampton's testimony, denies that Hampton made these statements to Plaintiff.  (Hampton Dep. at 172:7-173:15.)

According to Hampton, she told Plaintiff they should discuss how Plaintiff could balance her job with the City and her lawsuit, including the possibility of taking a leave of absence.  (Id. at 172:13-173:15.)  Hampton testified that she told Plaintiff: "You haven't been here long enough to have accrued vacation time to take the time you would need if you were going to pursue a lawsuit, but that doesn't mean you can't take leave."  (PSMF ¶ 73 (quoting Hampton Dep. at 172:20-23).) Hampton did not ask Plaintiff for any further detail regarding the lawsuit against Henry County, so Plaintiff did not go into any additional detail at that time.  (PSMF ¶ 74.)  Hampton testified that she did not recall "anything that was negative" about her interaction with Plaintiff on December 30, 2014.  (Id. ¶ 75.)

Defendant maintains that Hampton walked away from the conversation

believing that Plaintiff was planning to file suit, not that she had already done so. (DSMF ¶ 54.) Hampton initially testified that Plaintiff lied about the fact that her Henry County Suit had already been filed at the time they spoke on December 30, 2014. (PSMF ¶ 78.) In contrast to her testimony that Plaintiff had lied about whether the lawsuit had been filed, Hampton later testified that she and Plaintiff had a "disconnect" because she did not understand from her conversation with Plaintiff that the lawsuit had been filed.[1] (Id. ¶ 79.) When asked whether there is a difference between "disconnect" and "lying," Hampton testified: "Absolutely. And I'm trying to give the benefit of the doubt every chance that I can." (Id. ¶ 80 (quoting Hampton Dep. at 173:21-22).) Plaintiff testified that Hampton did not give any indication that she was upset, but "[s]he was very matter of fact." (Wiley Dep. at 177:24-178:1.)

At the time Hampton spoke to Plaintiff about the Henry County Suit, Patrick had already reviewed the contents of the lawsuit and had spoken to Plaintiff about her claims on two separate occasions. (PSMF ¶ 76.) By the time Hampton met with Plaintiff in Plaintiff's office, Plaintiff had explained the allegations in the Henry County Suit and her decision to file suit to Patrick. (Id. ¶ 77.)

When Plaintiff notified Patrick and Hampton of her lawsuit, Plaintiff had not missed work and had not carried out any activities related to the lawsuit during her working hours for the City of Atlanta. (Id. ¶ 82.) Hampton testified that she believed she and Plaintiff also had a "disconnect" regarding Hampton's statements related to Plaintiff taking leave from her job at the City of Atlanta as a result of the Henry County Suit. (Id. ¶ 83.) Specifically, Hampton testified:

> The first one is around the leave. And that to me is an example of a disconnect. I hear, if you needed time to do something that you need to do with your former employer and it will take time away from the office, even if you haven't accrued the time, you can still take the time. You can't be paid for it. I would see that as a positive.

---

[1]     Plaintiff claims that this is implausible, but Plaintiff cites no evidence directly contradicting Hampton's testimony that that was her belief.

What I'm hearing from you is I'm telling her to go away.  So that is a disconnect.  I don't believe that that's a lie.  I don't believe she heard what I said, which was, "You could take time to do what you might need to do.  You just can't get paid for it if you accrued."  Do I believe that that's some blatant attempt to lie?  It could be that she doesn't understand how leave works.  So I'm trying to give the benefit of the doubt.

(Id. (quoting Hampton Dep. at 174:17-175:8).)

The City of Atlanta employee handbook, which applies to employees within the Law Department, does not require employees to report to the City any civil lawsuits that they file or are otherwise involved in.  (PSMF ¶ 84.)  Hampton testified that she believed it is a matter of "good judgment" for a City of Atlanta employee to report to their supervisors when a civil lawsuit or dispute arises that may require time away from work.  (Id. ¶ 85.)  Hampton testified that Plaintiff failed to exercise good judgment because, even though Plaintiff reported her lawsuit against Henry County, Plaintiff lied about "[w]hy she left the county, the nature of her relationship leaving the county, and whether or not the lawsuit had been filed."  (Id. ¶ 86 (quoting Hampton Dep. at 106:23-25).)

Following her conversation with Hampton on December 30, 2014, about the Henry County Suit, Plaintiff scheduled a meeting with Hampton, as instructed, for Wednesday, January 7, 2015.  (PSMF ¶ 72.)  Patrick also recalls having had a third phone call with Patrick.  (Id. ¶ 87.)  Patrick denies that she and Plaintiff had three phone calls that day.  (Id. ¶ 88.)  Patrick testified that the second conversation with Plaintiff on December 30, 2014, was short and did not occur until after Plaintiff had spoken to Hampton later that day.  (Id.)  Plaintiff testified that, in her third and final phone call with Patrick on December 30, 2014, Patrick asked if Plaintiff had spoken to Hampton.  (Id. ¶ 89.)  Plaintiff described her conversation with Hampton and told Patrick about the meeting scheduled for Wednesday.  (Id.)  Patrick did not tell Plaintiff that she needed to do anything else at that time.  (Id.)  During their final phone call on December 30, 2014, Patrick did not ask Plaintiff why she did not tell

her about the Henry County Suit sooner.[2]  (Id. ¶ 90.)

G.    Prior Whistleblower Lawsuit Brought Against Hampton

When Plaintiff got home on December 30, 2014, she researched the whistleblower lawsuit that had been filed by a previous City of Atlanta Law Department employee against Hampton.  (Id. ¶ 93.)  After doing her own research about that lawsuit, Plaintiff became concerned that her job at the City of Atlanta was in jeopardy.  (Id.)

In 2012, Holly Smith ("Smith"), a former Assistant City Attorney for the City of Atlanta, filed a lawsuit against the City and named Cathy Hampton individually in claims for retaliation in violation of the GWA and for intentional infliction of emotional distress.  (Id. ¶ 94.)  Smith named several other City of Atlanta employees, including her supervisors from the Law Department, as individual defendants in her suit.  (Id.)

Hampton and the other individual defendants filed a motion to dismiss on the claims filed by Smith against them individually, and those claims were dismissed by the Superior Court.  (Id. ¶ 95.)  Smith refiled her claim for intentional infliction of emotional distress against Hampton and the other individual defendants, relying on the same allegations, and Hampton and the other individual defendants filed a motion for sanctions for the refiling of frivolous claims.  (Id. ¶96.)  Hampton and the other individual defendants ultimately were awarded $136,623 in sanctions.  (Id.)

H.    Reactions of Patrick and Hampton to Plaintiff's Lawsuit

On December 30, 2014, after speaking to Plaintiff, Hampton spoke to Laura Burton ("Burton"), the Deputy City Attorney of Litigation, and told her about her conversation with Plaintiff.  (Id. ¶ 105.)  Patrick also spoke to Burton about the filing of the Henry County Suit before Patrick spoke to Hampton.  (Id. ¶ 106.)

---

[2]    Patrick testified that she asked Plaintiff that question in her first phone conversation that morning.  (Patrick Dep. at 128:1-2.)

Patrick stated in an email sent to Plaintiff at 6:31 P.M. on December 30, 2014, that she planned to "reach out to [Hampton] this evening."  (Id. ¶ 107.)  Patrick testified that she spoke to Hampton once and only briefly on December 31, 2014, before sending an email copy of Plaintiff's Henry County Suit Complaint.  (Id. ¶ 108.)  Patrick stated:

> I wanted to make sure that Ms. Hampton knew that a lawsuit had been filed.  I had gotten the impression from one of the deputies that people – that deputies and Ms. Hampton did not know that an actual complaint had been filed with the court.  And so I wanted to call Ms. Hampton and make sure that she knew that.  And I was going to send her the complaint.

(Id.)

In the early hours of December 31, 2014, shortly after midnight, Patrick emailed a copy of Plaintiff's Henry County Suit Complaint to Hampton, with the message "FYI."  (PSMF ¶ 109; Hampton Dep. at 181, Ex. 9.)  In the early hours of December 31, 2014, shortly after midnight, Patrick also emailed a copy of Plaintiff's Henry County Suit Complaint to Burton.  (PSMF ¶ 110.)

Hampton testified that she spoke to Patrick twice after receiving notice of Plaintiff's Henry County Suit – once before she (Hampton) read the complaint and once after she read the complaint.  (Id. ¶ 111.)  Hampton explained: "The conversation before I read it was [Patrick's] impressions of what was in it, and then the conversation afterwards was what I thought about it after I had given it a review."  (Id. (quoting Hampton Dep. at 177:14-17).)  Hampton also clarified that during these conversations, "[t]he details of the lawsuit just weren't important.  We didn't talk that much about the details of the lawsuit." (Hampton Dep. at 177:21-22.)  Patrick testified that she and Hampton did not discuss terminating Plaintiff when they spoke on December 31, 2014.  (PSMF ¶ 114.)  Patrick testified that she and Hampton did not discuss preparing a statement related to Plaintiff's lawsuit, even after receiving notice of it.  (Id. ¶ 129.)

Hampton read the Henry County Suit Complaint at some point over the

holiday weekend between December 31, 2014, and when she returned to work on January 5, 2015. (PSMF ¶ 112.) On December 31, 2014, at 11:53 A.M., Hampton emailed a copy of Plaintiff's Henry County Suit Complaint with the note "Happy New Year" to all of her senior team so that they could "read it together and discuss next week." (Id. ¶ 113; Hampton Dep., Ex. 10.)

Over the weekend, Patrick considered Plaintiff's continued employment. (DSMF ¶ 61.) Ultimately, Patrick concluded that she has lost her trust in Plaintiff and could not continue to work with her:

> [M]y issue with LaTonya as my chief counsel was that I didn't trust her anymore. So I decided over the weekend that I was going to make the recommendation to the city attorney that she be terminated because I have to be able to communicate with my chief counsel, give confidential information to my chief counsel. And because she kept that information from me for 11 days, I no longer trusted her.

(Patrick Dep. at 152:8-16.)

The following Monday, January 5, 2015, Patrick recommended to Hampton that Plaintiff be fired. (DSMF ¶ 64.) Specifically, Patrick told Hampton that she did not believe that Plaintiff had been truthful with her during the interview process and that she had not handled the disclosure of her lawsuit properly. (Id. ¶ 65.) As a result, Patrick told Hampton that she did not trust Plaintiff and had no confidence in her judgment, both of which were essential components of Plaintiff's position. (Id. ¶ 66.) Hampton accepted Plaintiff's recommendation, concluding that her Deputy City Attorney should not be forced to work with someone whom she no longer trusted and in whom she no longer had confidence. (Id. ¶ 67.) Hampton also agreed with Patrick's recommendation, as she felt that Plaintiff's failure to disclose the lawsuit before filing it indicated a lack of judgment and understanding about the nature of her role. As Hampton testified:

> The only issue of the lawsuit that struck me was the first one, was about the timing. And it goes back to judgment and understanding the role, that you're going to have media scrutiny at a very different level at Hartsfield; that if you're going to work at the world's busiest airport, there will be media alerts and media scrutiny at a very different level, and you have to prepare for it and see it coming around every corner.

> That's a part of the job description.  That's a part of good judgment.
> So giving the heads-up to communications and to me so that we could
> be prepared for media scrutiny and have a statement ready and having
> an opportunity to do that, and we weren't afforded an opportunity to
> do that.

(Hampton Tr. at 177:23-178:12.)   Hampton was also concerned by the fact that

Plaintiff was seeking reinstatement to her prior position with Henry County,

notwithstanding her current employment with the City.  (DSMF ¶ 69.)

When Plaintiff returned to work on the morning of January 5, 2015, she

arrived to find an email notice from Hampton's assistant that her meeting with

Hampton for January 7 to discuss the Henry County Suit was cancelled.  (PSMF ¶

115.) Hampton testified that she cancelled the meeting that Plaintiff had scheduled

for January 7, 2015, because she "no longer wanted to have the meeting." (Id. ¶ 116

(quoting Hampton Dep. at 188:2-3).)  When asked to explain, Hampton testified,

"Because I didn't want to meet.  I don't have to have a reason not to meet with

someone.  I don't want to meet." (Hampton Dep. at 188:5-7.)

That afternoon, Patrick and Robert Godfrey, the City's employment counsel,

met with Plaintiff and notified her that her services were no longer needed.  (DSMF

¶ 70.)  Plaintiff testified to the following exchange with Patrick on January 5, 2015,

when she was terminated:

> Kimberly called me into her office and said, "You've been terminated
> effective immediately."
>
> I asked her why; She said, "Your services are no longer needed."
>
> I said, "Is this because of the lawsuit?"
>
> She said, "Your services are no longer needed."
>
> I said, "Kimberly, this is not right."  And I think I said something else.
>
> And I may have asked again, but I remember, two or three times – . . .
>
> And she said, "Your services are no longer needed."  And I remember
> thinking, she was sounding very robotic, like she was programmed to
> say that, is what went through my mind, which was not what I was
> used to her exhibiting.
>
> And at that point, I knew I was not going to get a real reason.  And

> then she said, "If you want to, we can allow you an opportunity to resign your employment," which I declined.

(PSMF ¶ 118.)

Patrick did not offer Plaintiff the option of resignation until Plaintiff asked whether the termination was related to her Henry County Suit. (Id. ¶ 119.) Plaintiff did not resign her employment with the City of Atlanta. (Id. ¶ 120.) With respect to resignation, Plaintiff testified: "I didn't know what I was resigning for. I didn't want to resign. I wanted to work. I loved that job. I was excited about doing that job. I wanted to work there. I enjoyed the people I was working with, and what I had learned thus for [sic]. So I didn't resign my employment." (Id. (quoting Wiley Dep. at 191:4-9).)

Patrick then terminated her. (DSMF ¶ 72.) In the City's Responses to Plaintiff's Interrogatories, verified by Kimberly Patrick, the City stated three reasons for Plaintiff's termination:

> 1) Plaintiff was dishonest during her interview with the City of Atlanta when she was specifically asked about her feelings toward Henry County; 2) Plaintiff was dishonest about the status of the Henry County lawsuit during her subsequent conversation with Cathy Hampton; and 3) as a result of Plaintiff's dishonesty, lack of transparency, and lack of judgment by purposely delaying disclosure of her lawsuit until news of it was published in the newspaper, Ms. Patrick lost confidence in Plaintiff's ability to effectively serve as a supervisor and leader within the organization.

(Defendant's Objections and Responses to Plaintiff's First Interrogatories [Doc. No. 66-9], Response to Interrogatory No. 6.)

Hampton testified that Plaintiff lied about the "nature of her relationship leaving the county, and whether or not the lawsuit had been filed." (PSMF ¶ 123 (quoting Hampton Dep. at 106:23-25).) First, Hampton testified that Plaintiff had lied by stating that her separation from Henry County was amicable. (PSMF ¶ 123.) Second, and as mentioned previously, Hampton testified that Plaintiff lied about the fact that her Henry County Suit had already been filed at the time they spoke on December 30, 2014. (Id.)

The City of Atlanta subsequently reported to the Georgia Department of Labor that Plaintiff had resigned her employment.  (Id. ¶ 121.)

I.      Decisionmaking in the City of Atlanta Law Department

Hampton makes the final decisions regarding matters within the Law Department, including employment matters. (Id. ¶ 124.) Hampton relies on Patrick with respect to management of the Aviation Division, but she does not always accept Patrick's recommendations.  (Id. ¶ 125.)  Patrick always tries to provide Hampton with all of the relevant information to assist Hampton in making decisions regarding the Aviation Division and does not hold anything back.  (Id. ¶ 126.)

Generally, when Patrick has a performance issue with an employee in the Law Department, she would bring in the employee, tell them the issue, and work the matter out.  (Id. ¶ 127.)  Patrick has terminated one employee during her 20 years with the City of Atlanta, while she was serving as the Deputy City Attorney for the Litigation Division.  (Id. ¶ 128.)  Prior to terminating the employee, Patrick placed the employee on a performance improvement plan in order to notify her of the areas she needed to improve.  (Id.)

## II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 requires the entry of summary judgment when no genuine issue as to any material fact is present and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In seeking summary judgment, the moving party bears the initial responsibility to demonstrate that there is no genuine issue as to any material fact and that summary judgment is appropriate.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Allen v. Bd. of Public Educ., 495 F.3d 1306, 1313 (11th Cir. 2007). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

When evaluating the merits of a motion for summary judgment, the court

must view all evidence and factual inferences raised by the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts concerning the facts in favor of the non-moving party. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (citation omitted). The court is not permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence. Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

A fact is material if proof of its existence or nonexistence would affect the outcome of the case under controlling substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Additionally, an issue of fact is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Id. An issue of fact is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or "not significantly probative." Id. at 249-250. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original).

## III.  ANALYSIS

Plaintiff brings a claim in this lawsuit against Defendant under 42 U.S.C. § 1983 for retaliatory termination in violation of the First Amendment right to free speech. As a government employer, the City of Atlanta may not discharge a public employee in retaliation for speech protected by the First Amendment. Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989) (citing Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). The Supreme Court has long held that "while a citizen who enters public service must accept certain limitations on her freedoms, she does not relinquish the First Amendment rights she would otherwise enjoy as a citizen to comment on matter of public interest." Alves v. Bd. of Regents of the Univ. Sys. of Georgia, 804 F.3d 1149, 1159 (11th Cir. 2015) (quoting

Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) and
Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968))
(internal marks omitted).

To prevail on a claim that a government employer retaliated against an
employee for constitutionally protected speech, a public employee must prove that:
(1) her speech was on a matter of public concern; (2) her First Amendment interest
in engaging in the speech outweighed the employer's interest in prohibiting the
speech to promote the efficiency of the public services it performs through its
employees; and (3) her speech played a "substantial part" in the employer's decision
to discharge her.  Anderson v. Burke Cty., 239 F.3d 1216, 1219 (11th Cir. 2001)
(citation omitted). If the plaintiff establishes these first three prongs, the government
then has the burden to show, by a preponderance of the evidence, that it would have
made the same employment decision in the absence of the protected conduct.  Id.
(citation omitted). "The first two factors are questions of law designed to determine
whether the First Amendment protects the employee's speech."  Id. (citation
omitted).  The final two factors present questions of fact "designed to determine
whether a retaliatory motive was the legal cause of the challenged employment
decision."  Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1564 (11th Cir.
1995).

Explaining the underlying principles at play in the context of the
aforementioned test, the Supreme Court stated the following in Borough of Duryea,
Pa. v. Guarnieri, 564 U.S. 379, 131 S. Ct. 2488, 180 L. Ed. 2d 408:

This framework reconciles the employee's right to engage in speech
and the government employer's right to protect its own legitimate
interests in performing its mission.  There are some rights and
freedoms so fundamental to liberty that they cannot be bargained away
in a contract for public employment.  Our responsibility is to ensure
that citizens are not deprived of these fundamental rights by virtue of
working for the government.  Nevertheless, a citizen who accepts
public employment must accept certain limitations on his or her
freedom. The government has a substantial interest in ensuring that all
of its operations are efficient and effective.  That interest may require
broad authority to supervise the conduct of public employees.  When

someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. Restraints are justified by the consensual nature of the employment relationship and by the unique nature of the government's interest.

Id. at 386-87 (internal marks and citations omitted).

Defendant argues that Plaintiff cannot establish any of the requisite elements of her retaliation claim. Defendant first contends that Plaintiff's Henry County Suit constitutes, at best, speech on a matter of modest public concern. Defendant next argues that the City's interests as Plaintiff's employer vastly outweigh Plaintiff's First Amendment interest. Finally, Defendant argues that the content of Plaintiff's speech played no role in Defendant's decision to terminate her employment. Defendant's arguments and the evidence relied on by Defendant in support of those arguments only create genuine issues that must be decided by a jury.

A.      Constitutionally Protected Speech

Speech that is protected under the First Amendment is that which takes place when one speaks as a citizen about a matter of public concern. Akins v. Fulton Cty., 420 F.3d 1293, 1303-04 (11th Cir. 2005). That is, the speech must be "a matter of political, social, or other concern to the community" at large, as opposed to a purely personal matter. Id. at 1303 (citation omitted). "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick v. Myers, 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). Under Garcetti, cited supra, an employee is not speaking as a citizen, but rather as an employee, when he "make[s] statements pursuant to [his] official duties. Id. at 421-22.

To determine "[w]hether an employee's speech addresses a matter of public

concern," the Court must examine "the content, form, and context" of the speech, on the basis of the record as a whole. <u>Connick</u>, 461 U.S. at 147-48. The Court must be mindful that an employee's speech is rarely "entirely private or entirely public." <u>Alves</u>, 804 F.3d at 1162 (citation omitted). As such, the Court must determine whether the "main thrust" of the employee's speech is essentially public or private in nature. <u>Maggio v. Sipple</u>, 211 F.3d 1346, 1352 (11th Cir. 2000) (citing <u>Morgan v. Ford</u>, 6 F.3d 750, 755 (11th Cir. 1993)). The plaintiff bears the burden of proof to demonstrate that his speech was as a citizen on a matter of public concern. <u>Ferrara v. Mills</u>, 781 F.2d 1508, 1514 (11th Cir. 1986).

In this case, Plaintiff brought a lawsuit and, in doing so, was not speaking pursuant to her official duties. Her employment as the County Attorney of Henry County had already been terminated, so there can be no argument that she was acting in her official role. Plaintiff, as a former employee, did seek to protect her rights, which the Court will discuss further below, but the Court finds that the lawsuit is part of an overall effort by Plaintiff to advance the interests of the citizens of Henry County and that the main thrust of the lawsuit is to bring to the public's attention and to seek to thwart the alleged misconduct of public officials in Henry County. Thus, the Court finds, as an initial matter, that Plaintiff was speaking as a citizen, not as an employee. <u>Boyce v. Andrew</u>, 510 F.3d 1333, 1342 (11th Cir. 2007) (stating that the court initially must determine whether the plaintiff is speaking as a government employee or as a citizen). Consideration of the content, form, and context of Plaintiff's speech, as revealed by the whole record, supports this finding.

### 1.    Content

While not dispositive, "[c]ontent is undoubtedly the most important factor in assessing whether particular speech touches on a matter of public concern." <u>Mitchell v. Hillsborough Cty.</u>, 468 F.3d 1276, 1284 (11th Cir. 2006) (citations omitted). "In assessing the content of a public employee's speech, we look to whether the speech communicates a 'subject of legitimate news interest, a subject of general

interest and of value and concern to the public at the time.'" Id. (alternations and citation omitted).

Unquestionably, in the case at bar, Plaintiff's Henry County Suit involves matters of personal interest to Plaintiff.  The Henry County Board of Commissioners got rid of her position she had served in for years after she reported and refused to participate in alleged misconduct and illegal activity.  As such, Plaintiff complains about and seeks relief for her alleged retaliatory termination.  However, the personal component of Plaintiff's Henry County Suit does not end the analysis and automatically strip the speech of First Amendment protection.  Alves, 804 F.3d at 1162 (instructing that courts must look at "main thrust" of speech); see also DeGroat v. DeFebo, 87 F. Supp. 3d 706, 720 (M.D. Pa. 2015) ("While it is true that the nature of a retaliation lawsuit is fundamentally an employee grievance in which an employee complains about mistreatment by his or her superiors and requests redress for that mistreatment, its position in relation to the concept of public concern cannot be dismissed in such a summary manner.").

A close review of the Henry County Suit Complaint informs that the allegations implicate concerns that are more than just "ordinary workplace grievances" or internal employee matters.  Guarnieri, 564 U.S. at 392.  Specifically, Plaintiff's Henry County Suit Complaint includes allegations concerning the following alleged misconduct, corruption, and illegal activity by Henry County officials:

- repeated violations of law and mismanagement of the County by a former County Manager, which Ms. Wiley reported to the Henry County Board of Commissioners;

- corruption and unlawful pressure by Commissioner Brian Preston on Ms. Wiley to settle a tax appeal on behalf of the largest ad valorem taxpayer in Henry County;

- another instance of threats and pressure by Commissioner Preston on

Ms. Wiley to discourage her from investigating the County's no-bid contract with its insurance broker to whom Commissioner Preston had close personal ties;

• violations of law by then-County Manager Jim Walker, including violations of the Open Records Act and interference with an employee's due process rights;

• the elimination of the County's independent, in-house legal department, which would allow the alleged misconduct to continue unchecked; and

• the hiring of new outside legal counsel without consideration of costs or conflicts of interest.

Many of these allegations concern wrongdoing against the public and not just against Plaintiff.

The Court finds that the Henry County Suit is not limited to personal grievances but attempts "to bring to light actual . . . wrongdoing [and] breach of public trust on the part of [government officials]." Connick, 461 U.S. at 148. "[A] core concern of the First Amendment is the protection of the 'whistle-blower' attempting to expose government corruption." Bryson, 888 F.2d at 1566; see also Cooper v. Smith, 89 F.3d 761, 765 (11th Cir. 1996) (holding that corruption in a police department is an issue of public concern); Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of [public] officials, in terms of content, clearly concerns matter of public import."); Marohnic v. Walker, 800 F.2d 613, 616 (6th Cir. 1986) ("Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law."); Hagan v. Quinn, 84 F. Supp. 3d 826, 830 (C.D. Ill. 2015) ("[L]awsuits about government waste, fraud, and systemic misconduct can be of public concern.").

In contrast to Ruotolo v. City of New York, 514 F.3d 184 (2d Cir. 2008), a case

relied on by Defendant in which the Second Circuit Court of Appeals held that an aggrieved former employee's lawsuit did not constitute speech on a matter of public concern, Plaintiff's Henry County Suit has a broader public purpose and does not just focus on "adverse career, financial and emotional effects that [Plaintiff] suffered personally" as a consequence of her alleged retaliatory termination. Id. at 189-90. Here, Plaintiff identified several ways that the public was harmed as a result of the elimination of her position, including that (1) certain county officials could operate without interference from an internal legal counsel required to notify the Board of conduct that fails to conform to the laws, rules, and regulations that govern County operations and (2) outside firms with conflicts of interest were retained.

Defendant makes much of the fact that the relief sought by Plaintiff in the Henry County Suit is for Plaintiff alone, a fact that the Second Circuit found to be significant in Ruotolo. Id. at 190. Plaintiff does not, for example, seek injunctive relief. However, seeking such personal remedies as damages or reinstatement does not necessarily mean that the lawsuit is purely personal and not a matter of public concern. Zorzi v. Cty. of Putnam, 30 F.3d 885, 897 (7th Cir. 1994) ("that [the plaintiff] had a personal motive for filing this suit and sought remedies of a personal nature (her job back and damages) does not prevent the lawsuit from being a matter of public concern"). The Court is mindful that "the harm that results from silencing or chilling public speech is neither negated nor mitigated merely because the speaker may have harbored motivations that were less than altruistic." Brennan v. Norton, 350 F.3d 399, 413 (3d Cir. 2003). Thus, while the relief sought is indicative of Plaintiff's personal motivation for bringing the Henry County Suit, the suit presents a quintessential example of speech that concerns the speaker but primarily concerns the public.

2.  *Form*

With respect to the form of Plaintiff's speech, a cursory review of relevant case law indicates that lawsuits are not automatically protected under the First

Amendment simply because they are filed.  Badia v. City of Miami, 133 F.3d 1443, 1446 (11th Cir. 1998).  However, the Court still finds that the form of Plaintiff's speech weighs in favor of the speech being constitutionally protected.  The speech here is a publicly-filed lawsuit, which courts, including at least one in the Eleventh Circuit, have found to bolster a plaintiff's claim that the speech is a matter of public concern.  Presley v. Graham, 936 F. Supp. 2d 1316, 1323-24 (M.D. Ala. 2013); Davis v. Robert, 192 F. Supp. 3d 847, 856 (E.D. Mich. 2016) (finding that a plaintiff's filing of a lawsuit alleging that government officials violated state law clearly is protected speech).

### 3.   *Context*

The context of Plaintiff's speech also favors a finding that she was speaking as a citizen addressing a matter of public concern.  If a public employee's speech is motivated solely by private interests, the speech is not constitutionally protected, even if the speech is relevant to a public issue.  Boyce, 510 F.3d at 1344-45 (11th Cir. 2007).  "[A] public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run."  Ferrara v. Mills, 781 F.2d 1508, 1516 (11th Cir. 1986) (citation omitted).  "The relevant inquiry is not whether the public would be interested in the topic of the speech at issue but rather is 'whether the purpose of the plaintiff's speech was to raise issues of public concern.'"  Lamar v. Clayton Cty. Sch. Dist., 605 F. App'x 804, 807 (11th Cir. 2015) (quoting Maggio, 211 F.3d at 1353).  However, consistent with what the Court stated above in discussing the content of Plaintiff's speech, "[t]hat a lawsuit seeks to vindicate a personal interest does not automatically make the lawsuit solely personal, as "[e]very lawsuit necessarily involves a plaintiff's personal interests."  Hagan, 84 F. Supp. 3d at 830.

Here, the Henry County Suit followed Plaintiff's having reported the alleged misconduct to the Corruption Unit of the FBI, which indicates she was not just seeking to benefit personally in exposing the alleged wrongful conduct of the Henry

County officials.  Defendant argues that Plaintiff's delay in airing concerns, even to the FBI, weighs against a finding that her speech is on a matter of public concern, as Plaintiff alleges that the corrupt conduct of Henry County's Commissioners began as early as mid-2012, whereas Plaintiff did not file her lawsuit until after she was terminated over two years later.  However, Plaintiff makes the compelling argument that her termination triggered the need to publicly expose the alleged corruption and misconduct in an effort to protect the public, as she was no longer in a position to address the misconduct and corruption internally.  Indeed, a review of the Henry County Suit Complaint indicates that Plaintiff long had been reporting the alleged misconduct and corruption internally and that opposing the misconduct and corruption was not something she decided to do simply following her termination. Again, the Court finds that the undisputed evidence in the record indicates that the lawsuit primarily is a part of an overall effort by Plaintiff to protect the public from the alleged corruption and wrongdoing of Henry County officials and to reduce the adverse impact on Henry County's finances and the cost of government to Henry County taxpayers.

Moreover, the evidence in this case reveals that the Henry County Suit did, in fact, attract media attention, which supports a finding that the speech is on a matter of public concern.  As the Supreme Court has stated, "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." City of San Diego v. Roe, 543 U.S. 77, 83, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004).  The news coverage of Plaintiff's Henry County Suit, "even if only local in nature, lends support to a finding that [the] lawsuit had a public interest component." Presley v. Graham, 936 F. Supp. 2d at 1323.

     *4.*     *Summary*

Insofar as the Court's analysis of the content, form, and context of Plaintiff's speech indicates that the main thrust of the Henry County Suit is a matter of public

concern, the Court finds that Plaintiff's speech in this regard merits First Amendment protection.

B.    *Pickering* Balancing Test

Because Plaintiff's speech was on a matter of public concern, the Court next must "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [City], as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed.2d 811 (1968)). In applying the Pickering balancing test, the Court considers the following factors: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made." Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1289 (11th Cir. 2000) (citations omitted).

Other considerations relevant to the Pickering balancing include the following:

> whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

Leslie v. Hancock Cty. Bd. of Educ., 720 F.3d 1338, 1346 (11th Cir. 2013) (quoting Rankin, 483 U.S. at 388). "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." Connick, 461 U.S. at 151-52. Still, "a stronger showing [by the public employer] may be necessary if the employee's speech more substantially involved matters of public concern." Id. at 152. "There is no bright-line standard, and Pickering requires a careful balancing of competing interests on a case-by-case basis." Stanley, 219 F.3d at 1289.

Here, Plaintiff's interest in whistleblowing speech is high. Akins, 420 F.3d at 1304. Whistleblowing speech necessarily creates some disruption, see Devlin v.

Kalm, 531 F. App'x 697, 705 (6th Cir. 2013), but "the First Amendment stands as a barrier to punishing a public employee simply because his/her speech disrupts the workplace," Brennan, 350 F.3d at 414.  A public employer's interest in preventing workplace disruption "does not weigh as heavily against whistleblowing speech as against other speech on matters of public concern."  Rivero v. City & Cty. of San Francisco, 316 F.3d 857, 866 (9th Cir. 2002); see also Conaway, 853 F.2d at 797 ("When balancing the rights of the employee against those of the employer, an employee's First Amendment interest is entitled to greater weight where he is acting as a whistle blower in exposing government corruption.").  In sum, whistleblowing speech "is entitled to significant weight in the Pickering balance." Pattee v. Georgia Ports Auth., 477 F. Supp. 2d 1253, 1264 (S.D. Ga. 2006).

In contrast, the Court finds that Defendant has not asserted an interest in prohibiting Plaintiff's protected speech that is sufficient to outweigh Plaintiff's right to speak as a citizen.  Indeed, the Court discerns from the evidence no real or potential injury or disruption to the efficiency of the Legal Department's operations as a result of the speech itself.  Since the lawsuit was not against the City of Atlanta, the lawsuit did not require the participation of the City of Atlanta in response.  At best, the City might have gotten some inquiries from the media and Plaintiff may have needed some time away from work to participate in the litigation.  However, while Defendant makes much of the need for it to have received advance notice of the lawsuit to prepare for media attention, it is undisputed that Patrick and Hampton never even discussed preparing a statement related to Plaintiff's lawsuit, even after they received notice of it.  Moreover, at the time Plaintiff notified Patrick and Hampton of her lawsuit, Plaintiff had not missed work and had not carried out any activities related to the lawsuit during her working hours for Defendant.  Thus, there was ample time for arrangements to be made in connection with Plaintiff's work schedule, if that was a concern.

Defendant argues that the City's strong interest in maintaining an effective

working relationship between the managers of its Aviation Legal Division far outweighs any interest Plaintiff may have in her speech.  However, while Plaintiff's timing in notifying Patrick and Hampton of the filing of her lawsuit threatened to disrupt or had the effect of disrupting critical working relationships (i.e., impacting trust and Plaintiff's superiors' confidence in her judgment), there is no evidence or argument by Defendant that Plaintiff's speech itself – the lawsuit – had such an effect or potential effect.  Defendant argues only the following:

> Plaintiff's failure to advise Patrick, either in advance or contemporaneous to her filing of her Henry County lawsuit, which did in fact generate public relations inquiries for the City, caused irreparable damage to Patrick's trust and confidence in her.  Given the necessity for Patrick to establish and maintain a relationship with her Chief Counsel, Patrick reasonably determined that she could no longer work with Plaintiff.  Faced with a senior manager who could no longer work with her direct report, coupled with her own significant concerns about Plaintiff's apparent inability to exercise sound judgment and desire to be reinstated to her former position, Hampton accepted Patrick's termination decision.

(Defendant's Brief in Support of its Motion for Summary Judgement [Doc. No. 53-1] at 21-22.)

The manner, time, and place of Plaintiff's speech are relevant and the Court must not consider Plaintiff's speech in a vacuum, but the Court agrees with Plaintiff that Defendant is conflating its alleged non-retaliatory reason for Plaintiff's termination with its interest in regulating Plaintiff's speech.  See Stanley, 219 F.3d at 1289 n.15.  Like the public-employer defendant in Stanley, Defendant "appears to argue that [the Court] should weigh [Plaintiff]'s interest in making the protected speech against [the City]'s interest in firing [Plaintiff] (rather than the [City]'s interest in prohibiting the speech)."  Id.  Defendant's argument is without merit, as Defendant confuses the second prong of the analysis with the third and fourth prongs.  Id. (citing Vista Cmty. Servs. v. Dean, 107 F.3d 840, 845 (11th Cir. 1997)).

All things considered, Plaintiff's interest in her whistleblower speech, which is entitled to great weight, is not outweighed by Defendant's stated interests in receiving notice of a lawsuit prior to its filing and maintaining effective working

relationships among its managers in the Aviation Legal Division.

        C.      Causal Connection Between Retaliatory Action and Protected Speech

The final issue for consideration related to Plaintiff's burden is whether there is any genuine dispute of material fact as to whether Plaintiff's filing of the Henry County Suit was a motivating factor in her termination. "To succeed on a First Amendment retaliation claim, the plaintiff must show that the adverse employment action was causally related to the protected speech." Brillinger v. City of Lake Worth, 317 F. App'x 871, 878 (11th Cir. 2008) (citing Garcetti, 547 U.S. at 418). Plaintiff must prove that her speech "played a substantial or motivating role in the adverse employment action." Leslie, 720 F.3d at 1346. "[T]he plaintiff's burden in this regard is not a heavy one." Stanley, 219 F.3d at 1291.

"Relevant evidence includes the temporal proximity of the speech to the termination, whether reasons given for the termination are shown to be pretextual, comments or actions indicating that the speech and termination were connected, whether the asserted reason for discharge varied, who instigated internal investigations or termination proceedings, evidence of management hostility to the type of speech in question, and other evidence of an employer's motive to retaliate." Pattee, 477 F. Supp. 2d at 1264 (citing Stanley, 219 F.3d at 1291 n.20). "There is no one factor that is outcome determinative, but all factors must be taken into account." Stanley, 219 F.3d at 1291 n.20.

Significant in this case is temporal proximity. Plaintiff's disclosure of the filing of the Henry County Suit and her termination only days later suggest a causal relationship. Akins, 420 F.3d at 1305 (finding that the close temporal proximity between the protected speech and the adverse employment action suggested a causal relationship); Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 745 (11th Cir. 1996 ("Where termination closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse employment decision). Construing the evidence and all reasonable inferences therefrom in Plaintiff's favor,

the temporal proximity of Plaintiff's disclosure to her termination suggests a causal connection.

Defendant's initial failure to provide Plaintiff an explanation for her termination also is telling. According to Plaintiff, the only thing that Patrick stated upon communicating Plaintiff's termination was that Plaintiff's services were no longer needed. When Plaintiff inquired whether her termination was connected to the Henry County Suit, Patrick then offered Plaintiff the option to resign.

The reasons ultimately offered for Plaintiff's discharge also have varied. Before addressing these reasons, the Court finds the identity of the decisionmaker in this case to be worthy of comment. Again, construing the evidence and the reasonable inferences drawn therefrom in Plaintiff's favor, as the Court must at this stage, the Court finds that Cathy Hampton was the final decisionmaker. While Defendant attempts, in its reply brief, to refute that Hampton was the final decisionmaker, Defendant has already conceded that Patrick only recommended that Plaintiff be terminated. (DSMF ¶ 64; Defendant's Brief in Support of its Motion for Summary Judgment [Doc. No. 53-1] at 12.) Defendant maintains that Hampton merely accepted Patrick's recommendation, (DSMF ¶ 67; Defendant's Brief in Support of its Motion for Summary Judgment [Doc. No. 53-1] at 12), but Defendant cannot seriously refute that Hampton ultimately made the decision. Hampton's testimony was extensive and unambiguous concerning her position as the final decisionmaker with respect to employment decisions, notwithstanding any deference she gave to recommendations made by members of her legal team. (See Hampton Dep. at 79:8-81:2, 106:10-13, 192:2-19.)

The record evidence reveals many disputes and discrepancies regarding Defendant's alleged reasons for terminating Plaintiff's employment. Defendant has offered several different reasons, unrelated to the content of Plaintiff's protected speech, for the termination of Plaintiff's employment. Among those reasons are that Plaintiff purportedly lied during her interview by saying her departure from Henry

County was amicable and Plaintiff lied by saying she was considering a lawsuit against Henry County when she first spoke to Hampton on December 30, 2014. Hampton eventually testified that she and Plaintiff must have had a "disconnect." However, Plaintiff's sworn testimony creates disputed issues of fact as to whether Plaintiff lied or mislead Hampton or Patrick about her departure from Henry County and whether she lied about or mislead Hampton to believe that she had not yet filed the Henry County Suit. Indeed, Hampton's backtracking with respect to some of the initial positions she took raises jury questions.

Patrick's asserted reasons for recommending termination of Plaintiff's employment have included, among others, that (1) Plaintiff mislead her during her interview by creating the impression that her separation from Henry County was "amicable" and (2) Plaintiff mishandled the disclosure of her lawsuit. However, the discussions during Patrick's interview of Plaintiff concerning Plaintiff's departure as County Attorney for Henry County are genuinely disputed. Further, since there is no official policy governing an employee's disclosure of a private lawsuit to the City of Atlanta, a jury also should weigh and consider Defendant's contention that Plaintiff mishandled the disclosure of her lawsuit.

Patrick and Hampton both testified that the substance of Plaintiff's allegations against Henry County were not important to them and that they did not consider the content of the lawsuit when contemplating Plaintiff's continued employment. However, if Plaintiff's testimony is believed, Patrick told Plaintiff that Hampton was not going to like the fact that Plaintiff filed the Henry County Suit, because Hampton had been the subject of a whistleblower lawsuit herself. Moreover, when Hampton emailed a copy of Plaintiff's Henry County Suit Complaint to all of her senior team, she told them that she was sending it so that they could "read it together and discuss next week." (Hampton Dep., Ex. 10.) It is undisputed that both Patrick and Hampton read the Henry County complaint and discussed its substance. Hampton testified in this regard:

> We had a conversation before I read it and after I read it.   The conversation before I read it was [Patrick]'s impressions of what was in it, and then the conversation afterwards was what I thought about it after I had given it a review.

(Hampton Dep. at 177:13-17.)  Hampton subsequently testified that the details were not important.   However, viewing the evidence in the light most favorable to Plaintiff, a jury could draw a reasonable inference that Hampton was displeased, or at least concerned, not only about Plaintiff's filing of the Henry County Suit and her failure to provide advance notice that the suit would be filed, but also about the content of the lawsuit itself.  It certainly may be the case that neither Hampton nor Patrick was concerned about the details of the lawsuit and that the content of the lawsuit had nothing to do with Plaintiff's termination, but this is testimony that a jury should weigh and consider.

Having considered all relevant factors in the instant case, the Court finds that Plaintiff has pointed to sufficient evidence from which a jury could reasonably infer that her Henry County Suit played a substantial part in the decision to terminate her employment.  Again, Plaintiff does not have to establish that her protected speech was the only reason for her termination.  She only has to show that her protected speech "played a substantial or motivating role in the adverse employment action." Leslie, 720 F.3d at 1346.  Thus, it is for a jury to weigh and consider Defendant's argument that Plaintiff was terminated based on her superiors' loss of trust and confidence in her judgment against Plaintiff's argument that her Henry County Suit played a substantial or motivating role in her termination.

D.   Termination of Plaintiff in Absence of Her Speech

Defendant finally argues that it would have taken adverse action against Plaintiff even in the absence of the protected speech.  If an employee satisfies the first three elements of a First Amendment retaliation claim, the burden shifts to the defendant to prove that it would have terminated the plaintiff in the absence of the protected speech.  Stanley, 219 F.3d at 1288.  Here, Defendant argues that it has met

this burden simply because the record reflects no causal connection between Plaintiff's speech and Defendant's employment decision.  Under the circumstances of this case, the Court finds that this, too, is an argument raising an issue of fact that must be resolved by a fact finder.

## IV.    CONCLUSION

Based on the foregoing, the Court **DENIES** Defendant's Motion for Summary Judgment [Doc. No. 51] and **ORDERS** the parties to file a proposed consolidated pretrial order within thirty (30) days from the entry of this Opinion and Order.

SO ORDERED this <u>2nd</u> day of <u>October</u>, 2017.


<u>s/  CLARENCE COOPER</u>
CLARENCE COOPER
SENIOR UNITED STATES DISTRICT JUDGE